Ryan A. Semerad
WSB # 7-6270
The Fuller & Semerad Law Firm
242 South Grant Street
Casper, WY 82601
Ph: 307.265.3455
Fax: 307.265.2859
semerad@thefullerlawyers.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| ALBANY COUNTY CONSERVANCY, )<br>)<br>WYOMING ASSOCIATION OF )<br>PROFESSIONAL ARCHAEOLOGISTS, )<br>)<br>MICHELLE WHITE, )<br>)<br>NATALIA JOHNSON, )<br>)<br>J. MICHAEL LOCKHART, )<br>)<br>*Petitioners*, )<br>)<br>v. )<br>)<br>TRACEY LEBEAU, Administrator, )<br>   Western Area Power Administration, )<br>)<br>   and )<br>)<br>JENNIFER M. GRANHOLM, Secretary, )<br>   U.S. Department of Energy, )<br>)<br>*Respondents*. )<br> ) | Civ. No. _____<br><br>**PETITION FOR REVIEW OF
AGENCY ACTION** |

**<u>INTRODUCTION</u>**

1.     Petitioners Albany County Conservancy ("ACC"), Wyoming Association of

Professional Archaeologists, Michelle White, Natalia Johnson, and Michael Lockhart challenge

the Western Area Power Administration's ("WAPA") Record of Decision ("ROD") approving

an interconnection request for the Rail Tie Wind Project ("Project")—a proposed, utility-scale

wind energy facility to be constructed in Albany County, Wyoming—as well as the Final

Environmental Impact Statement ("FEIS") upon which the ROD relies to satisfy WAPA's duties

under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, and its

implementing regulations, 40 C.F.R. §§ 1500-1508; 10 C.F.R. Part 1021 (Department of Energy

regulations implementing NEPA). Petitioners also challenge WAPA's compliance, through the

agency's consultation process for and adoption of a Historic Properties Treatment Plan

("HPTP"), pursuant to the National Historic Preservation Act ("NHPA"), 54 U.S.C. §§ 306107-

306108, and its implementing regulations, 36 C.F.R. Part 800.

      2.     Although much about the Project remains undisclosed, the little that has been

revealed points to its immense scale and the gravity of its potential impact on the environment.

Slated to produce 504 megawatts ("MW") of electricity, the Project is larger than any wind farm

presently operating in Wyoming. It will sprawl across 26,000 acres of Albany County, carried

forward by 60 miles of new roads that will make over 109 stream crossings, threatening

innumerable sensitive wetlands in the Project's path. The Project calls for somewhere between

84 to 149 wind turbines, each measuring 500-675 feet tall—the approximate height of the Seattle

Space Needle—thereby marking a dramatic interruption of the wide-open vistas that have long

exemplified the Laramie Basin, and which serves as the location of the nationally recognized

Ames Monument National Historic Landmark ("Ames Monument NHL"). Further, WAPA itself

concedes that the Project's operation constitutes a "significant" threat to raptors, including

federally protected bald and golden eagles, that traverse or nest within, or adjacent to, the

proposed Project boundary.

3.    Notwithstanding the obvious potential for this Project to permanently mar Wyoming's rugged and enduring landscape, and severely impair and degrade the setting and feel of the Ames Monument NHL, remarkably, the ROD and FEIS evade any identification of the Project's actual expected impacts to various resources. In fact, the FEIS readily admits that it cannot say which turbines will be used for the Project, how large or how many of those turbines there will be, or even where the turbines and their associated infrastructure will actually stand within the proposed action area. Despite this stunning dearth of dispositive information, WAPA's FEIS proceeds to analyze the Project's likely effects by engaging in what amounts to guesswork adorned with rhetorical misdirection. In the few instances where it admits there might be a potentially significant impact, WAPA shrugs off any serious consideration of those effects in the FEIS by deferring its required analysis to reports that will not be completed until many years *after* the NEPA process has been completed—if at all. In the event that these post-ROD reports are actually completed, they will not be subject to public scrutiny or meaningful participation to shape alternatives that can reduce and mitigate foreseeable Project impacts identified in those reports. In short, WAPA's conclusions about the Project's environmental impacts amount to little more than "just trust us." And, in any event, the only post-ROD reports contained on WAPA's project website pertain solely to historic and cultural impacts as part of WAPA's NHPA consultation process; it appears that no other resources were evaluated by WAPA after issuing the ROD. *See* WAPA, Rail Tie Wind Project, https://www.wapa.gov/ transmission/transmission-environmental-review-nepa/rail-tie-wind-project/.

4.    WAPA's desire to evade any serious environmental review is also evident in its consideration of alternatives, which ordinarily serves as "the heart" of the NEPA process. 40 C.F.R. § 1502.14. In the FEIS here, however, WAPA "analyzed" only two: (1) the "No Action"

alternative, whereby WAPA would deny the Project's interconnection request; and (2) wholesale approval of the Project, as proposed and without conditions to mitigate environmental impacts, and without any information about the Project's actual design, or any realistic environmental and cumulative impact analyses. Even if WAPA had disclosed the requisite information about the scope and intensity of the Project's actual impacts, the limited range of alternatives considered in the FEIS cannot possibly discharge the agency's duty under NEPA. Yet, rather than simply do what NEPA requires, WAPA chose instead to exclude the vast majority of the Project's scope from review by relying on an illogical and unexplained understanding of "connected actions" under NEPA's implementing regulations.

5.     WAPA also acted arbitrarily, capriciously, and unlawfully under Sections 106 and 110(f) of the NHPA and the regulations that implement those provisions, 54 U.S.C. §§ 306107, 306108; 36 C.F.R. Part 800—as well as the 2021 Programmatic Agreement ("PA")—during its development and ultimate adoption of the HPTP. For instance, during crucial junctures in HPTP development, WAPA deliberately excluded the involvement of participating parties in the NHPA-required consultation process, including Petitioner ACC, as well as many other consulting parties. In addition, despite significant criticism of WAPA's proposal for avoiding, minimizing, and mitigating harm to historic and cultural resources (including the Ames Monument NHL), WAPA ultimately adopted an HPTP that arbitrarily and unlawfully fails to comply with the agency's obligations under Sections 106 and 110(f) to avoid and minimize the Project's harm, let alone mitigate that harm, in a manner that is commensurate to the Project's grave, decades-long adverse effects to the Ames Monument NHL and other significant resources.

6.     For these reasons, and as explained in further detail below, WAPA has violated NEPA, the NHPA, the implementing regulations for both statutes, and acted in a manner that is

"arbitrary and capricious," an "abuse of discretion," "otherwise not in accordance with law," and "without observance of procedure required by law," within the meaning of the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). The ROD, FEIS, and HPTP must be set aside and remanded for further decisionmaking consistent with federal law.

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346(a)(2) (United States as defendant); 28 U.S.C. § 2201 (declaratory relief); and 28 U.S.C. § 2202 (injunctive relief).

## PARTIES

8.      Petitioner Albany County Conservancy ("ACC") is a nonprofit corporation, with hundreds of members and supporters, headquartered in Laramie, Wyoming. As a grassroots organization comprised of concerned residents, the ACC works to protect and preserve the open spaces of Albany County through community outreach and education efforts, as well as direct advocacy. Petitioner ACC has participated in and throughout the public comment process under NEPA here, including by submitting comments in response to WAPA's Draft EIS, FEIS, and ROD. The ACC also served as a consulting party during the WAPA's Section 106 and 110(f) processes under the NHPA, and submitted many comment letters urging WAPA to consider measures that would be much more effective to avoid, minimize, and mitigate harm to the Ames Monument NHL and other affected historic properties and cultural resources. Although the ACC appreciates and encourages sustainable energy generation, it is committed to ensuring that such projects will exist in harmony with the unique, rich ecosystems found in Albany County by encouraging thorough pre-construction site assessments, studies of alternatives and mitigation

measures, and meaningful participation in such processes by subject matter experts and other stakeholders.

9.      Petitioner Wyoming Association of Professional Archaeologists is a nonprofit organization with over 100 members committed to promoting and maintaining professional archaeology in the state of Wyoming. The Association seeks to promote and advocate for professional archaeological interests throughout the state. As a professional organization committed to the development and dissemination of archaeological information from Wyoming, the Association has a strong interest in protecting areas of historical and cultural significance, including those located on the state's public lands. The Association regularly provides expert input on state and federal projects that will affect the Association's interests by submitting public comments. On this Project, for example, the Association was designated a consulting party under the NHPA and submitted multiple letters advocating for stronger protections to avoid or minimize adverse Project effects to the Ames Monument NHL and other affected historic properties and cultural resources.

10.     Petitioner Michelle White is a resident of Albany County, Wyoming. Her property, where she resides full-time, sits immediately adjacent to the Project's proposed footprint in Tie Siding, Wyoming. After searching for nearly two years, she purchased her 35-acre property in 2010 because it would allow her to enjoy the quiet serenity and solitude of this region of Wyoming, including unspoiled views of the Laramie Basin.

11.     Ms. White derives deep personal satisfaction from viewing and/or interacting with birds that visit her property. Each spring, for example, she puts out feeders to attract different species, especially hummingbirds, that regularly visit and/or nest on her property. She also enjoys watching the bald and golden eagles that regularly traverse and/or roost on her property.

12.     Ms. White regularly visits, utilizes, and otherwise enjoys myriad other sites within Albany County that will be directly impacted by the Project's construction and operation. For instance, she regularly hikes and hunts on a parcel of state-owned land that will be subsumed into the Project's footprint. Each spring, Ms. White applies for, and typically receives, an elk hunting tag from the Wyoming Game and Fish Department for that parcel of land, which is located in Elk Hunt Area #8. If the Project is built, she will no longer apply for a tag in this area.

13.     Ms. White also derives deep personal satisfaction from visiting historic sites that will be directly impacted by the Project. For example, she visits the Ames Monument NHL at least once or twice per year to introduce guests to this unique location of national importance and the significant history that it represents. She has been visiting the Ames Monument NHL since she was a child, when her grandparents would take her every year to see how the summer solstice illuminates the inside of the Ames Monument NHL. As such, visiting the Ames Monument NHL each year invokes fond memories of her childhood and provides a special experience unlike any other historic or cultural resource in this region of Wyoming.

14.     The proximity of Ms. White's home to the Project's proposed site makes her one of the closest residents to it; in fact, the Project will be visible from Ms. White's front porch and it will be audible throughout her property constantly. After learning about the Project, Ms. White worked closely with an independent sound expert who specializes in acoustic impacts from large-scale projects like that challenged here. In relevant part, the expert concluded that, based on available information, ambient noise levels on Ms. White's property attributable to the Project's operation will regularly exceed levels recommended by public health organizations, including the World Health Organization. Hence, if the Project is permitted to proceed, Ms. White will likely be forced to relocate; if she remains, she will be forced to withstand these

unsafe noise levels on a constant basis, thereby adversely affecting her physiological and mental health.

15.     The Project will also impair Petitioner White's ability to observe and enjoy the natural ecological processes that occur on her property and the nearby public lands where the Project will be sited. The Project will introduce an industrial, unnatural visual impediment to the landscape, thereby spoiling the viewsheds which caused her to purchase the property in the first place. Likewise, because the Project will kill and/or disturb a "significant" number of eagles, other bird species, and bats, it will further impair Ms. White's enjoyment of her property by significantly reducing her opportunities for observing native and declining wildlife species.

16.     Petitioner Natalia Johnson is a resident of Albany County, Wyoming. She owns and resides on property located roughly one mile from the Project's proposed site. Although Ms. Johnson has lived in Wyoming her entire life, she and her husband purchased their current residence in Tie Siding, Wyoming in 2020. They purchased that property because it is located in a safe, quiet area, and in close proximity to one of the only publicly accessible plots of state land in the area.

17.     Ms. Johnson derives deep personal satisfaction from the natural world, and especially those elements located on or nearby her property. She and her family routinely hike, bike, hunt, and fish on a nearby tract of public land that will be within the Project's footprint. She routinely observes and greatly enjoys witnessing bald eagles that regularly catch fish from or roost nearby the pond located on the publicly accessible state land mentioned above. In addition, she and her family apply for tags authorizing hunting on that land each year during elk and deer hunting seasons. Ms. Johnson's husband is an outfitter who earns a living from guiding hunting trips in various parts of the state, including areas in and around the Project's proposed footprint.

18.    As currently proposed, the Project's laydown yard will be situated directly adjacent to the bus stop used daily by Ms. Johnson's children. In addition, the construction and operation of the Project will cause a dramatic increase in the amount of traffic, dust, air pollution due to vehicle emissions, and noise on the otherwise quiet roads around Ms. Johnson's home.

19.    Petitioner J. Michael Lockhart is a 28-year resident of Albany County, Wyoming. Mr. Lockhart is a trained wildlife biologist and retired after a 33-year career with the U.S. Fish and Wildlife Service. Over his professional career, and since his retirement, Mr. Lockhart has focused on field research to assess risks to bald and golden eagles from various development projects, including wind energy projects. Since 2014, Mr. Lockhart has been trapping and satellite tagging golden eagles for three separate research projects in Wyoming, including for the U.S. Fish and Wildlife Service; satellite tag-prototype trials for Wildlife Computers; and a joint wind risk assessment through the U.S. Geological Survey and Conservation Science Global, Inc. Mr. Lockhart has intimate knowledge and familiarity with breeding, foraging, migration, and other behaviors, as well as essential habitat needs, of eagles in Wyoming, including in the area of the proposed Project.

20.    Mr. Lockhart has spent considerable time in central and south-central Wyoming researching eagle habitat use and movements and evaluating wind project development risks to eagles. Since 2014, Mr. Lockhart has trapped 220 golden eagles in Wyoming and satellite tagged 152 of those eagles.  Of the 152 tagged eagles, 119 were captured and tagged on or adjacent to active or proposed wind project sites in Wyoming as part of the research projects described above. Data gleaned from satellite-tagged golden eagles allow researchers to assess area activity, decipher patterns, and predict potential impacts from wind energy projects. Ten golden eagles tagged by Mr. Lockhart in Wyoming died by wind turbine strikes, which is 40 percent of the 25

documented human caused deaths of golden eagles actually satellite-tagged on or adjacent to active wind projects in Wyoming. That rate of loss from wind turbines alone is too extreme to maintain golden eagle population stability. Yet, additional eagles tagged by Mr. Lockhart were killed by transmission lines, vehicle collisions, and electrocution—all of which are sources of mortality that will undoubtedly be compounded by wind energy facilities improperly sited in sensitive areas for eagles.

21.     Mr. Lockhart derives immense personal, scientific, professional, recreational, and aesthetic enjoyment from observing bald and golden eagles (and other bird species) engaging in their natural behaviors in the Project area unimpeded by wind turbines, transmission lines, and energy-related vehicles that threaten death and injury to eagles. Moreover, Mr. Lockhart's strong interests in the eagles that inhabit the Rail Tie Project area and the surrounding region are harmed by WAPA's failure to take a hard look at the Project's foreseeable impacts to bald and golden eagles (or any serious evaluation of cumulative impacts to eagles in the region), including by deferring consideration of eagle issues until after WAPA's issuance of its ROD, after which WAPA no longer retains discretion to grant, deny, or condition its interconnection authorization. Mr. Lockhart is also harmed by the fact that, after issuance of the ROD, WAPA does not appear to have conducted even a belated analysis of eagle impacts, including cumulative impacts, as required by federal law.

22.     The Petitioners, including members and supporters of the ACC and the Wyoming Association of Professional Archaeologists, regularly visit and will continue to visit the areas in and around the Project's proposed location, to observe and appreciate wildlife (including birds and bats that will be killed by the Project's construction and operation), native prairie landscapes, unspoiled ecological processes, and the iconic historic and cultural resources, including the

Ames Monument NHL, located in the affected region. Petitioners enjoy activities in the immediate vicinity of the Project's proposed location, including hiking, hunting, wildlife viewing, and aesthetic enjoyment. This use and enjoyment involves many health, recreational, moral, scientific, spiritual, professional, educational, aesthetic, and other purposes that would be irreversibly destroyed, harmed, impaired, and/or degraded by the Project that WAPA's ROD and HPTP authorize and thus make possible in this location.

23.     If allowed to proceed, the Project will impair the interests of the ACC, its members and supporters, and the individual Petitioners by killing, disturbing, and/or harassing wildlife (including birds, bats, and game animals), that utilize and/or otherwise migrate through the Project area, and which Petitioners have a longstanding interest in observing and/or studying in their undisturbed, natural state. Likewise, the Project will impair Petitioners' personal enjoyment of their respective properties (and adjacent properties or public roads they frequently traverse and use in myriad ways for recreation and enjoyment) by introducing unnatural and unsightly visual intrusions; increased traffic, noise, pollution, and dust; and a near-constant acoustic disturbance from the decades-long operation of the Project's turbines.

24.     In addition, the Project harms Petitioners' procedural interests afforded to them under NEPA and the NHPA. As residents of Albany County who will be immediately and daily affected by the Project's impacts, Petitioners have a vested interest in ensuring under NEPA and the NHPA that all potential environmental impacts, and alternatives thereto—as well as all measures for avoiding, minimizing, and mitigating effects to historic and cultural resources— have been disclosed and fully considered by WAPA before any decision to authorize the Project. Because those impacts have not been disclosed, as detailed below, and because no alternatives have been presented that entail fewer environmental consequences (let alone any that can avoid

or significantly minimize harm to historic and cultural resources), Petitioners have not been notified of or had any opportunity to comment on the Project's environmental impacts, nor did WAPA allow them to meaningfully shape the development of measures that could reasonably avoid or minimize (or better mitigate) harm to the Ames Monument NHL and other historic or cultural resources.

25.    The serious legal violations alleged in this Petition, traceable directly to WAPA's conduct, cause concrete injury to the aesthetic, conservation, recreational, scientific, educational, historic, cultural, and wildlife preservation interests of Petitioners, including by adversely affecting the behavior of wildlife that Petitioners enjoy observing and otherwise benefit from, and by impairing the unspoiled prairie landscapes, which contain myriad historic and cultural resources and artifacts, that Petitioners enjoy and otherwise benefit from. Petitioners' actual, concrete interests have been, are currently being, and, absent relief from this Court, will continue to be adversely and irreversibly injured by WAPA's failure to comply with federal law. Relief from this Court, including vacatur of the ROD, FEIS, and HPTP challenged here pending full compliance with NEPA and the NHPA, will remedy Petitioners' injuries.

26.    Respondent Tracey LeBeau is the Administrator and Chief Executive Officer of WAPA. Accordingly, she is responsible for overseeing WAPA's decision challenged in this action and is sued solely in her official capacity.

27.    Respondent Jennifer M. Granholm is the Secretary of Energy and is ultimately responsible for overseeing the work of WAPA, a constituent agency within the U.S. Department of Energy. She is sued solely in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### A.    The National Environmental Policy Act

28.    NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).[1] At the most basic level, NEPA is intended to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens *before* decisions are made and before actions are taken." *Id.* § 1500.1(b)-(c) (emphasis added).

29.    The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—is charged with administering NEPA, and has promulgated regulations implementing the Act that are "binding on all federal agencies." *See id.* § 1500.3; *see also id.* §§ 1500-1508.

30.    Under NEPA, federal agencies are required to consider the potential environmental impact of *all* agency actions. 42 U.S.C. §§ 4321-4347. The touchstone of NEPA is the EIS; federal agencies must prepare an EIS for any "major Federal action significantly

---

[1] The Council on Environmental Quality ("CEQ") first promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978), followed by a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618 (Apr. 25, 1986). More recently, CEQ published a new rule, effective September 14, 2020, which further revised the 1978 regulations. In 2022 and 2024, CEQ again revised the regulations to the version currently in operation. *See* 87 Fed. Reg. 23453 (April 20, 2022); 89 Fed. Reg. 35,442 (May 1, 2024). However, the NEPA analysis challenged here arose prior to the 2020, 2022, and 2024 amendments and is thus governed by the 1978 regulations, as amended in 1986. *See* FEIS at 1-4 n.1. Accordingly, Petitioners cite throughout to the regulations as previously codified at 40 C.F.R. Parts 1500-1508, which applied to WAPA's decision under review.

impacting the quality of the human environment." *Id.* § 4332(c). An EIS ensures that all potentially significant environmental effects have been considered and disclosed to the public *during* the decision-making process. 40 C.F.R. §§ 1501.2, 1502.5; *see also* 42 U.S.C. § 4332(2)(C)(i) (requiring agencies in an EIS to prepare a "detailed statement" analyzing "reasonably foreseeable environmental effects of the proposed agency action").

31.    Within the EIS itself, federal agencies must identify and disclose all direct, indirect, and cumulative impacts of the proposed action, consider a reasonable range of alternative actions and their potential impacts, and disclose all irreversible and irretrievable commitments of resources attributable to the action. *Id.* § 4332(2)(C). CEQ has deemed the alternatives analysis "the heart" of the NEPA process because it "present[s] the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

32.    The agency's identification and disclosure of all potential impacts (and the alternatives thereto) are commonly referred to as the agency's duty to take a "hard look" at the environmental impacts of its decision. The three kinds of effects ordinarily discussed in an EIS are "direct effects," "indirect effects," and "cumulative impacts." *Id.* §§ 1502.16, 1508.7, 1508.8.[2] "Direct effects" are those "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). "Indirect effects" are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative impacts are those which result from the incremental impact of the action when added to other

---

[2] "Effects and impacts as used in [NEPA's implementing] regulations are synonymous." 40 C.F.R. § 1508.8.

past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

33.     Where there is incomplete or unavailable information, NEPA requires that "[i]f the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the [EIS]." *Id.* § 1502.22(a).

34.     NEPA also requires consideration in an EIS of multiple types of actions, including "connected actions" and "cumulative actions." *Id.* § 1508.25(a). "Connected actions" are those that "are closely related and therefore should be discussed in the same impact statement"; actions are connected if they: (i) "Automatically trigger other actions which may require environmental impact statements"; (ii) "Cannot or will not proceed unless other actions are taken previously or simultaneously"; or (iii) "Are interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1508.25(a)(1). "Cumulative actions" are those that "when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." *Id.* § 1508.25(a)(2).

35.     To fully explain the potential effects of alternatives in an EIS, NEPA requires federal agencies to evaluate all "appropriate mitigation measures" adopted to alleviate identified impacts from the proposed action, and identify any additional "[m]eans to mitigate adverse environmental impacts." *Id.* §§ 1502.14(f); 1502.16(h).

**B.      Department of Energy Regulations Implementing NEPA & WAPA Guidance**

36.     The Department of Energy ("DOE"), WAPA's parent agency, has promulgated numerous regulations specific to its implementation of NEPA. *See* 10 C.F.R. Part 1021.

37.     Under its implementing regulations, DOE and its constituent agencies "must integrate the NEPA process and coordinate NEPA compliance with other environmental review requirements to the fullest extent possible." *Id.* § 1021.341. Where its NEPA review may overlap with environmental reviews required by other statutes, DOE or its agencies "shall determine the applicability of other environmental requirements early in the planning process, . . . ensure compliance" with those environmental requirements "to avoid delays, and shall incorporate any relevant requirements as early in the NEPA review process as possible." *Id.*

38.     Where DOE prepares an EIS that includes mitigation measures designed to reduce an action's effects on the environment, it "shall prepare a Mitigation Action Plan that addresses mitigation commitments expressed in the ROD." *Id.* § 1021.331(a). That plan must "explain how the corresponding mitigation measures, designed to mitigate adverse environmental impacts associated with the course of action directed by the ROD, will be planned and implemented," and must "be prepared before DOE takes any action directed by the ROD that is the subject of a mitigation commitment." *Id.* Each plan must be "as complete as possible." *Id.* § 1021.331(c).

39.     WAPA has published guidance concerning interconnection requests, which includes specific recommendations about how it will implement NEPA. *See* WAPA, *General Requirements for Interconnection* at 11-12 & Attach. E (July 14, 2017), https://bit.ly/3LiGifl [hereinafter "Guidance"]. In view of NEPA's dual aims of ensuring that federal decisions are "based on understanding of environmental consequences," and that the public is adequately informed of those consequences, 40 C.F.R. § 1500.1(b)-(c), WAPA's Guidance advises applicants that "[a] detailed, firm project proposal from the Requestor and a well-defined WAPA proposed action facilitate efficient compliance with environmental review requirements." Guidance at 11. Further, the Guidance warns applicants that, "[a]lthough it is advisable to begin

16

environmental reviews as early as practicable, beginning them before significant project features have been identified or decided on is not advised." *Id.*, Attach. E at 9.

40.     With respect to WAPA's duty under NEPA to analyze a reasonable range of alternatives, WAPA's Guidance explains that WAPA must consider in each EIS: (1) the "no action alternative," which "is usually the scenario in which WAPA would deny the interconnection request"; (2) the "Proposed action"; (3) "Other reasonable courses of action"; and (4) action alternatives containing "[m]itigation measures that are not already a part of the proposal developed by the applicant." *Id.*, Attach. E at 4.

41.     WAPA's Guidance also contains provisions governing mitigation measures applied to "portions of an applicant's proposal where WAPA or another Federal agency do not have jurisdiction . . . ." Guidance, Attach. E at 5. In such circumstances, WAPA "will need a commitment from the applicant that its proposed mitigation will be implemented." *Id.* Thereafter, "[t]his mitigation becomes a part of the applicant's proposed project and must be implemented." *Id.*

### C.  **The National Historic Preservation Act and Its Implementing Regulations**

#### *1.     Section 106 of the NHPA*

42.     Congress enacted the NHPA in 1966, with the express intent that "the historical and cultural foundations of the nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American People." Pub. L. 89-665, 80 Stat. 915 (1966).

43.     Section 106 of the NHPA requires that federal agencies "take into account the effect" of any "undertaking" on historic properties. 54 U.S.C. § 306108. The term "undertaking" is broadly defined to mean "a project, activity, or program funded in whole or in part under the

direct or indirect jurisdiction of a Federal agency," and expressly includes activities "requiring a Federal permit, license, or approval." *Id.* § 300320(3); *accord* 36 C.F.R. § 800.16(y). "Historic property" is likewise broadly defined to include "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object." 54 U.S.C. § 300308.

44.     The NHPA also established the Advisory Council on Historic Preservation ("ACHP"), an independent agency with the authority to issue binding regulations to implement Section 106. 54 U.S.C. §§ 304101-304102, 304108(a). Relevant here, those regulations provide that agencies "must complete the Section 106 process *prior to* the approval of . . . the undertaking or *prior to* the issuance of any license." 36 C.F.R. § 800.l(c) (emphases added); *accord* 54 U.S.C. § 306108 (instructing that agencies "shall take into account the effect of the undertaking on any historic property" "prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license"). Although agencies may authorize "nondestructive project planning activities before completing compliance with section 106," they may only do so where "such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties." 36 C.F.R. § 800.l(c). Agencies must also "ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking." *Id.*

45.     In identifying historic properties that will be affected by an undertaking, an agency must "[s]eek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area,

and identify issues relating to the undertaking's potential effects on historic properties." *Id.* §
800.4(a)(3). Agencies are also directed to "seek and consider the views of the public in a manner
that reflects the nature and complexity of the undertaking and its effects on historic properties,
the likely interest of the public in the effects on historic properties, confidentiality concerns of
private individuals and businesses, and the relationship of the Federal involvement to the
undertaking." *Id.* § 800.2.

46.     Where an agency determines that an undertaking "has the potential to cause
effects on historic properties," it must initiate the Section 106 process. *Id.* § 800.3. As part of that
process, the agency must "[d]etermine and document the area of potential effects" ("APE") of
the undertaking. *Id*. § 800.4(a)(l). The APE is defined by regulation to include the area "within
which an undertaking may directly or indirectly cause alterations in the character or use of
historic properties." *Id.* § 800.16(d). The size and scope of the APE "is influenced by the scale
and nature of an undertaking and may be different for different kinds of effects caused by the
undertaking." *Id.* An agency must also identify properties within the APE that have not been
previously evaluated for eligibility for inclusion in the National Register of Historic Places, but
nevertheless meet the criteria for inclusion. *Id.* § 800.4(a)(4), (c).[3]

47.     "Where alternatives under consideration consist of corridors or large land areas . .
. the [agency] may use a phased process to conduct identification and evaluation efforts." *Id.* §
800.4(b)(2). Final identification and evaluation of historic properties may also be deferred "if it

---

[3] The NHPA authorizes the Secretary of the Interior to maintain the National Register of Historic
Places ("NRHP") as a list of "districts, sites, buildings, structures, and objects significant in
American history, architecture, archeology, engineering and culture." 36 C.F.R. § 60.1. "Site" is
defined by regulation to broadly include "the location of a significant event, a prehistoric or
historic occupation or activity, or a building or structure, whether standing, ruined, or vanished,
where the location itself maintains historical or archeological value regardless of the value of any
existing structure." *Id.* § 60.3.

is specifically provided for" in a programmatic agreement or other appropriate documentation as allowed under the regulations. *Id.* Under those circumstances, the agency "should establish the likely presence of historic properties within the [APE] for each alternative . . . through background research, consultation and an appropriate level of field investigation," and taking into account the views of the consulting parties. *Id.* The regulations require that the agency "proceed with the identification and evaluation of historic properties" as specific aspects of an alternative are "refined." *Id.*

48.     Where the agency identifies historic properties that may be affected by the undertaking, the agency must "notify all consulting parties" and "invite their views on the effects and assess adverse effects" of the undertaking on those properties. *Id.* § 800.4(d)(2). Once historic properties that may be affected by the proposed undertaking are identified, the agency must, in consultation with consulting parties, determine whether the undertaking will have "adverse effects" on the identified historic properties. *Id.* § 800.5(a). An adverse effect is defined by regulation to include "when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the [NRHP] in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1). In making its determination, the agency must consider "all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the [NRHP]." *Id.* Significantly, "[a]dverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id.*

49.     If, as a result of the review of the undertaking's effects to historic properties, the agency determines that there will be no adverse effects (and the State Historic Preservation Office ("SHPO") and the ACHP agree with that determination), then the agency's NHPA obligations are fulfilled and it may move forward with authorization and implementation of the undertaking. However, "[i]f an adverse effect is found, the agency . . . shall consult further to resolve the adverse effect." *Id.* § 800.5(d)(2). To resolve adverse effects on historic properties, the agency must consult with consulting parties "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id.* § 800.6(a). The ACHP may participate in this resolution process. *Id.* § 800.6(a)(1).

50.     Where, as here, the ACHP elects to participate, and the agency, the SHPO, and the ACHP "agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement." *Id.* § 800.6(b)(2). This memorandum of agreement "evidences the agency['s] compliance with section 106 and [its implementing regulations] and shall govern the undertaking." *Id.* § 800.6(c). The agency shall ensure that the undertaking is carried out in accordance with the memorandum of agreement. Relevant here, for "complex project situations," a memorandum of agreement may take the form of a "programmatic agreement." *Id.* § 800.14(b). Such agreements are suitable for: "when effects on historic properties are similar and repetitive or are multi-State or regional in scope"; "when effects on historic properties cannot be fully determined prior to approval of an undertaking"; or, when "nonfederal parties are delegated major decision-making responsibilities," among other situations. *Id.* § 800.14(b)(1)(i)-(iii).

   *2.      Section 110(f) of the NHPA*

51.    Since 1980, the NHPA has also required a higher level of protection for a special category of nationally significant historic resources known as National Historic Landmarks ("NHLs"). An NHL must have national historic significance; must "possess exceptional value or quality in illustrating or interpreting the heritage of the United States"; must retain a high degree of historic integrity; must be recommended by the National Park System Advisory Board; and may only be designated by the Secretary of the Interior. 36 C.F.R. § 65.4. Today, this designation is limited to just over 2,600 exceptionally unique sites. *See* NPS, *National Historic Landmarks*, https://www.nps.gov/subjects/nationalhistoriclandmarks/index.htm.

52.    Section 110(f) of the NHPA provides heightened protections for NHLs—above and beyond that required under Section 106 for the more than 98,000 historic properties currently on the NRHP—and gives federal agencies special responsibilities and obligations to avoid and minimize harm to NHLs. When considering an undertaking that will directly and adversely affect an NHL, "the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark." 54 U.S.C. § 306107.

53.    The legislative history of the NHPA states that Section 110(f) "does not supersede Section 106, but complements it by setting a higher standard for agency planning in relationship to landmarks . . . ." H.R. Rep. No. 1457, at 36-37 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6378, 6401. Congress gave the Secretary of the Interior (rather than ACHP) authority to promulgate guidelines governing the implementation of Section 110. The Secretary's guidelines (promulgated through the National Park Service) confirm that Section 110(f) imposes a stricter standard than Section 106: "Section 110(f) of the NHPA requires that federal agencies exercise a higher standard of care when considering undertakings that may directly and adversely affect

NHLs." 63 Fed. Reg. 20,496, 20,503 (Apr. 24, 1998); *see also id.* at 20,496 ("[F]ederal agencies have affirmative responsibilities under section 110 that go beyond the responsibility for compliance with section 106.").

54.     The guidelines explain that project proponents seeking federal authorization are "expected to incur reasonable costs" to ensure compliance with Section 110(f), with "reasonable costs . . . determined on a case-by-case basis." *Id.* at 20,501. The guidelines further mandate that agencies must "consider all prudent and feasible alternatives to avoid an adverse effect on the NHL" and specify a three-part balancing test to be applied whenever such alternatives may appear to "require undue cost" or "compromise the undertaking's goals and objectives." *Id.* at 20,503. That test requires an agency to assess: (1) "[t]he magnitude of the undertaking's harm to the historical, archaeological and cultural qualities of the NHL; (2) "[t]he public interest in the NHL and in the undertaking as proposed"; and (3) "[t]he effect a mitigation action would have on meeting the goals and objectives of the undertaking." *Id.*

### D.  The Administrative Procedure Act

55.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

56.     When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *Id.* The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

## FACTUAL BACKGROUND

### A.     The Western Area Power Administration

57.     WAPA is a federal power marketing administration within DOE that markets and transmits wholesale electrical power in 15 western states, using over 17,000 circuit-miles of high voltage transmission lines. Its primary mission "is to market Federal power to project use and preference customers comprised of non-profit public entities such as electric cooperatives, Native American tribes, municipal utilities, and Federal and state government entities." Guidance at 1. WAPA "is not defined as a 'public utility' under sections 205 and 206 of the Federal Power Act," meaning that it "is not subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC) under those statutes." *Id.*

58.     Although WAPA is not considered a public utility under Federal law, it nevertheless "maintains a voluntary reciprocity Open Access Transmission Service Tariff ["Tariff"] on file with FERC, which codifies the procedures and general requirements for customers seeking to obtain transmission and/or generator interconnection services from WAPA." *Id.* In broad terms, this voluntary Tariff gives the agency discretion to offer third-party, energy-generators open access (i.e., transmission capacity to deliver electricity) on WAPA's transmission system through an interconnection if: (1) there is available capacity in the transmission system; (2) existing reliability and service are not degraded by the additional

electricity transmitted; and (3) the environmental effects of the proposed interconnection are deemed acceptable to WAPA's decision-makers. *See* FEIS at 1-1; *see also* WAPA, *Open Access Transmission Tariff*, Attach. L, at 44 & 45 (Dec. 20, 2020),

http://www.oasis.oati.com/WAPA/WAPAdocs/WAPA-OATT-Effective-2021-1215.pdf

(WAPA's "decision to execute [an interconnection agreement] is dependent on conclusions reached in the record of decision under NEPA," and "that NEPA review could result in a decision not to execute the [interconnection agreement], or to delay [its] execution.").

### B.     The Rail Tie Wind Project

59.     The Project, as described in WAPA's NEPA analysis, "is a proposed utility-scale wind energy facility under development by ConnectGen Albany County LLC (ConnectGen)." FEIS at 1-1. It will be built on roughly 26,000 acres of public and private lands in southeastern Albany County, Wyoming, and has been designed to generate up to 504 megawatts ("MW") of energy to be sold to potential customers. The Project would be comprised of 84 to 149 turbines, each measuring up to 675 feet, depending upon the type of turbine selected.

60.     To deliver power generated by the Project to market, ConnectGen (now owned by Repsol) must first obtain permission to transmit that power on a transmission line equipped to handle the Project's expected flow. The nearest such line to the Project is the Ault-Craig 345-kV transmission line, which is owned, in part, by WAPA and bisects the Project footprint. The proximity of this line means that ConnectGen would only need to construct four miles of generation-tie ("gen-tie") lines to connect the Project to the Ault-Craig line.

61.     The next closest 345-kV, non-WAPA transmission line is approximately 20 miles from the Project and, according to WAPA, "may not have sufficient available transmission capacity to support ConnectGen's Project." ROD at 4. Thus, assuming ConnectGen could even

purchase capacity on that line, it would first need to finance and construct at least an additional 16 miles of single-circuit 345-kV generation-tie lines to reach the nearest alternative interconnection point. Because the cost of the requisite gen-tie line runs roughly $1,343,800/mile, the cost of reaching this alternative interconnection point would add *at least* $21,500,800 to the Project's ultimate price tag—or, as WAPA puts it, would substantially "affect[] the economics of the Project."[4]

62.     Given the relative costs associated with accessing WAPA- versus non-WAPA transmission lines, ConnectGen applied to interconnect the Project to the Ault-Craig line and for transmission service on that line via WAPA's Large Generator Interconnection Process.

63.     WAPA announced its consideration of the application through a Notice of Intent ("NOI") in the Federal Register, dated December 30, 2019. 84 Fed. Reg. 71,921 (Dec. 30, 2019). The NOI announced that "WAPA will prepare an EIS on the interconnection of the proposed Project in accordance with NEPA (42 U.S.C. 4321 et seq.); DOE NEPA Implementing Procedures (10 CFR part 1021), and the CEQ regulations for implementing NEPA (40 CFR parts 1500-1508)." 84 Fed. Reg. at 71,922. Further, the NOI stated that this EIS would "identify and analyze the environmental impacts of ConnectGen's entire proposed Project," even though—according to WAPA—its involvement is limited to consideration of "the interconnection request and the physical interconnection to WAPA's existing transmission system." *Id.*

**C.     WAPA's NEPA Process for the Rail Tie Wind Project**

       *1.     Draft EIS for the Rail Tie Wind Project*

---

[4] Juan Andrade & Ross Baldick, *The Full Cost of Electricity (FCe-): Estimation of Transmission Costs for New Generation* at 13, table 2 (2017), https://bit.ly/3qsdjfn.

64.     WAPA's Draft EIS ("DEIS") was published in March 2021. Like the NOI, the DEIS states that "WAPA's purpose and need is to consider and respond to the request for an interconnection agreement in accordance with its Tariff and the Federal Power Act, as amended." DEIS at 1-1, available at https://www.wapa.gov/wp-content/uploads/2023/04/RTW_20210324_RailTieWind_DraftEIS_forPublicComment_508.pdf.

65.     Despite NEPA's command that federal agencies preparing an EIS shall—"to the fullest extent possible"—"study, develop, and describe appropriate alternatives," 42 U.S.C. § 4332(2)(H), WAPA's DEIS described only two: the "Proposed Federal Action Alternative," and a "no action alternative." DEIS at 2-2. WAPA insisted that the former "is distinct from ConnectGen's proposal to construct a wind energy project," and WAPA's involvement is instead "limited to consideration of the interconnection request submitted by ConnectGen and the associated system upgrades that would be required, if approved." *Id.* Even though, according to the agency, the Project is both "the impetus for the requested interconnection request and WAPA's need for Federal action," the DEIS deems the Project itself a mere "connected action" because "ConnectGen's decision to construct the Project [] could proceed regardless of WAPA's involvement." *Id.* This distinction, WAPA asserts, relieves the agency of having to develop and analyze additional alternatives and, instead, only requires that WAPA "fully disclose the activities and associated impacts" of the Project "to inform WAPA's Federal action (decision on the interconnection request)." *Id.*

66.     Confusingly, the DEIS then proceeds to explain that the precise scope of impacts cannot be ascertained because neither the actual turbine model to be used nor the actual layout of those turbines had yet been decided by ConnectGen; these crucial aspects of the Project's full impact on the environment will only be decided "*after* the NEPA process is concluded and prior

to construction," based on factors "such as anticipated technology advancements, costs, and availability from manufacturers for delivery"—"if the interconnection request is approved." *Id.* (emphasis added).

67.    The DEIS's remaining "discussion" of potential impacts attributable to the Project is notably shallow or, at best, conjectural. Although the DEIS identifies a number of resources that will be directly impacted and foreseeably impaired by the Project's construction and operation—including wetlands, birds, bats, and historically significant cultural resources—the DEIS instead relies on a number of future reports that did not exist before the DEIS's publication for comment. *See* DEIS at 2-31, t.2-7 (listing "ConnectGen's *Future* Environmental-Related Plans," which would be developed later "to avoid or minimize adverse effects on environmental resources from construction, [operation and maintenance], and decommissioning" (emphasis added)).

68.    For example, despite recognizing that "[f]atalities resulting from collisions with turbines are expected to be the primary adverse effect on bat species," the DEIS concedes that those estimates are contingent on the Project layout's "unique ecological conditions and Project-specific features," neither of which were identified in the DEIS or disclosed to the public. *See* DEIS at 3-57 to -58 ("Fatality estimates based on studies of other wind energy facilities in western North America should be considered tentative because each facility has unique ecological conditions and Project-specific features making it challenging to draw robust conclusions about the relationship between bat mortality and turbine size."). Regardless, the DEIS assumes the Project will not entail population-level effects on bats because a not-yet-developed Bird and Bat Conservation Strategy ("BBCS") "would be developed and implemented to avoid and reduce potential impacts to avian and bat species." DEIS at 3-59.

69.     The DEIS takes a similar tact with the Project's likely impact on avian species, including eagles and other raptors, which routinely utilize airspace within the Project's rotor-swept zone. While conceding that "[w]ind turbine collision fatalities during the operational stage of the Project are expected to be the primary adverse effect on avian species," and that "bird mortality at turbines is well documented at many wind energy facilities," the DEIS ultimately fails to quantify those anticipated fatalities; instead, WAPA assures the public that impacts on avian populations will be made negligible by the future development of an undefined BBCS and the potential for ConnectGen to seek an incidental take permit from the U.S. Fish and Wildlife Service ("FWS") under the Bald and Golden Eagle Protection Act ("BGEPA"). *See* DEIS at 3-57 ("[T]he Project would develop and implement eagle conservation practices as part of its BBCS to comply with regulatory requirements and seek to minimize the unintentional take of eagles."); *see also id.* ("The Project could pursue a voluntary Eagle Incidental Take Permit (EITP) authorized under the BGEPA with the FWS.").

70.     The DEIS's reliance on undeveloped, future studies to sidestep an evaluation of impacts continues when discussing the Project's potential effects on wetlands and aquatic habitat. According to the DEIS, the Project will necessarily entail surface disturbance during construction and decommissioning, including by constructing roads that traverse sensitive wetlands. For example, the DEIS estimates that, within the analytical boundary, over 10 acres of wetlands will be impacted and 109 stream crossings will be necessary. *See* DEIS at 3-168. Still, WAPA estimates these impacts will be insignificant because "ConnectGen has committed to minimizing and mitigating potential impacts to wetlands and [Waters of the United States ('WOTUS')] through use of [Environmental Protection Measures ('EPMs')] and would comply with Section 404 permitting for any potential impacts to wetlands and/or WOTUS." *Id.* Yet, like

the BBCS, these EPMs remain largely undefined in the DEIS and their capacity to minimize impacts is therefore unknown.

71.     The DEIS also readily concedes that many of these wetlands, including "environmentally sensitive areas" and jurisdictional WOTUS, will only be identified *after* the NEPA process has been completed, or once ConnectGen prepares its "construction planning documents." DEIS at 2-21.

72.     The DEIS also punts any serious consideration of impacts on historically significant cultural resources. Depending on the Project's ultimate height and configuration, which is, again, undisclosed, it will likely impact multiple cultural and historic sites through direct ground disturbance and/or visual impacts that affect the resources' setting. *See* DEIS at 3-69 (listing cultural resources "within the Project Siting Corridors where Adverse Physical Impacts Could Occur if Not Avoided, Minimized, or Mitigated"). The DEIS notes, however, that not all resources have yet been identified and/or disclosed to the public because "[i]ntensive field surveys for cultural resources" will only proceed once the Project's siting corridors have been identified. *See id.* ("Intensive field surveys for cultural resources identification would proceed within areas of proposed Project ground disturbance within the Project siting corridors as an EPM."). This lack of disclosure at the DEIS stage—i.e., the primary juncture when an agency solicits public comment on an action—is troubling since "[g]round-disturbing construction activities could physically alter or destroy cultural resources in part or in whole." *Id.* Regardless, the DEIS ultimately shrugs off any potential impact to these resources by relying, again, on *potential* avoidance, minimization, and mitigation measures, including those required by the separate, but then-uncompleted, consultation process under the NHPA. *See, e.g.*, *id.* at 3-71 to -72.

73.     As noted above, the DEIS's only alternative to the proposed action is the "no-action alternative." Despite its earlier contention that the Project "could proceed regardless of WAPA's involvement," the DEIS's no-action alternative proceeds under the exact *opposite* assumption—i.e., that "the Project would not be built." *Id.* at 2-1. This, WAPA explained, is because "the nearest regional transmission lines that would not require a WAPA interconnection would instead require a much longer [gen-tie line], affecting the economics of the project," as explained above. *Id.*; *see also supra* ¶ 60. Hence, the no-action alternative assumes, if selected by WAPA, that none of the impacts associated with the Project will occur.

### 2.  *Petitioners' Comments on the DEIS*

74.     Petitioner ACC submitted comments in response to the DEIS on August 18, 2021. Although the DEIS comment period ostensibly closed on May 17, 2021, WAPA accepted Petitioners' comments in August 2021, explaining in response that the agency "encourages comments from the public throughout our NEPA processes, and your input will be considered."

75.     In their comments, Petitioners expressed serious reservations about how little of the scope and intensity of the Project's impacts had been disclosed in the DEIS. *See* Albany County Conservancy, *Comments on the Draft Environmental Impact Statement for the Rail Tie Wind Project* at 5 (Aug. 18, 2021) [hereinafter "ACC Comments"] ("WAPA's DEIS does not contain any reasonably complete assessment of the Project's environmental impacts because this purported analysis instead relies on a large number of reports and plans that do not yet exist."). The comments then identified a host of specific areas in the DEIS where WAPA chose to defer its analysis to some forthcoming report or analysis, including, *inter alia*, WAPA's assessment of direct, indirect, and cumulative impacts on avian species, bats, wetlands, and historic and cultural resources. *See id.* at 5-6. This flawed analysis, the ACC explained, not only fails to satisfy the

agency's duty under NEPA's "hard look" standard, but also frustrates NEPA's goal of fostering informed public participation. *Id.* at 7-9.

76.     The ACC's concerns regarding the lack of detailed impacts to wetlands and environmentally sensitive areas, including aquatic habitats, were echoed by the Environmental Protection Agency's ("EPA's") comments, which concluded—in that agency's expert opinion—that "the [DEIS] does not include analysis to support conclusions of insignificant, minimal, or negligible impacts to project area and downstream watersheds and streams." FEIS at C-232. Additionally, EPA urged WAPA to coordinate its review "with the U.S. Army Corps of Engineers (Corps) prior to publishing the Final EIS to determine if the proposed project will require an individual Section 404 permit under the CWA," and to identify "each type of [affected] water and include the direct/indirect permanent and temporary impacts to those waters." *Id.* at C-235.

77.     Petitioners' comments also took issue with WAPA's arbitrary characterization of the Project as a "connected action." As Petitioners explained, the Project is, and should have been analyzed as, a "major Federal action" under NEPA for several different reasons, including because it squarely falls within the definition of "major Federal action" under NEPA's implementing regulations, and because WAPA "has sufficient influence and control over the outcome and operation of the Rail Tie Wind Project for the Project to qualify" as such. ACC Comments at 11-13.

78.     In any case, the DEIS fails to explain *why* the vast majority of the Project has been labeled a "connected action" when it does not comport with the regulatory definition. *See* ACC Comments at 14 ("[T]he only conceivable justification for the claim that the Project is a 'connected action' is that it 'cannot or will not proceed' in the absence of WAPA's

interconnection authorization. However, if that is the case, then WAPA in fact exerts such a significant degree of control over the Project's outcome that the Project in fact constitutes a 'major Federal action' rather than merely a 'connected action.'").

79.     Petitioners' comments further explained why the DEIS's consideration of alternatives was inadequate and proposed a number of mid-range alternatives for WAPA's consideration in the FEIS. Responding to the DEIS's false dichotomy regarding the range of available actions (i.e., to merely grant or deny the interconnection request), Petitioners pointed out that "[b]ecause WAPA clearly possesses the authority to deny interconnection altogether on the basis of its NEPA review, it *a fortiori* possesses the authority to consider an alternative that would require additional environmentally protective measures as a condition for interconnection approval." ACC Comments at 10 (citing Tariff at 106). Regardless, "to the extent that WAPA believes it does not have such authority, NEPA nonetheless requires an EIS to 'include reasonable alternatives not within the jurisdiction of the agency.'" *Id.* at n.8 (quoting *S. Utah Wilderness Alliance v. U.S. Dep't of Interior*, 250 F. Supp. 3d 1068, 1074 (D. Utah 2017)).

### 3.  FEIS & WAPA's Failure to Respond to Comments

80.     WAPA published its FEIS for the Project in November 2021.

81.     As relevant here, the FEIS's analysis of environmental impacts and alternatives remained largely unchanged from that found in the DEIS. For example, WAPA declined in the FEIS to consider any additional alternatives beyond the proposed action (i.e., granting the interconnection request) and the no-action alternative. *See* FEIS at 2-1. Once again, WAPA disingenuously frames its alternative analysis by asserting that "ConnectGen's decision to construct the Project . . . could proceed regardless of WAPA's decision," but simultaneously assumes that without interconnection "the Project would not be built" due to the significant

additional financial expenditure that would be required by ConnectGen, which WAPA characterizes as "the economics of the Project." *Id.* at 2-1 to 2-2.

82.    Notwithstanding calls from the ACC, EPA, and many others to define and analyze the actual expected impacts of the Project (as well as cumulative effects that will impact many of the same resources in the region), the FEIS announces that the Project design is still forthcoming. *Id.* at 2-2 ("Final selection of the turbine model (and subsequent layout) would occur *after the NEPA process* is concluded and prior to construction." (emphasis added)). Thus, WAPA continues in the FEIS to defer identification and disclosure of nearly every relevant environmental impact to later reports that will purportedly be completed—if at all—only after the NEPA process is complete and the public no longer has the opportunity to weigh in or evaluate the comparative merits of various alternatives and mitigation measures. *See, e.g.*, *id.* at C-235 (alleging that "ConnectGen would complete a full field delineation of wetland features and consultation with [the Corps] after final design is complete but prior to construction"); *see also id.* at 3-57 ("*If* and when an appropriate amount of mitigation offset is established between FWS and ConnectGen, the impact to eagles *could* be reduced." (emphases added)).

83.    Similarly, although the FEIS's discussion of impacts on birds and bats provides vague comparisons of different turbine designs, it never identifies which turbine height is representative of the Project's likely impact, nor how that turbine design will impact avian and bat populations relative to its siting within the Project footprint; indeed, the FEIS concedes that "[t]he relationship between turbine height and bird and bat mortality risk is unclear for the range of turbines being considered," and that "Project construction and [operation and maintenance] would disturb roost sites and hibernacula for bats *if present in the siting corridors*," which, again, remain unidentified. *Id.* at 3-61. Further, although the FEIS claims that ConnectGen will

eventually "develop and implement a [bird and bat conservation strategy] to avoid and reduce potential impacts that may result from Project operations," it never discloses whether its conclusion that impacts to those species "would not be significant" is predicated on the implementation of that conservation strategy, or whether impacts would be insignificant independent of that plan. *See id.* at 3-61. Thus, the FEIS not only fails to disclose the likely impacts on birds and bats, it also fails to explain how, without this information, WAPA honestly concluded that "[i]mpacts . . . would not be significant as bird and bat populations are not expected to be affected." *Id.*; *see also id.* at 3-57 (concluding that "[a]vian fatalities from turbine strikes could affect individual birds but are not anticipated to be of a magnitude that would affect populations or communities of avian species.").

84.     As to cumulative impacts to resources that will be affected by the Project— including, for example, eagles and other regional wildlife—WAPA included a cursory discussion for each resource topic, concluding that for most affected resources there would be no cumulative impacts. *See* FEIS at 4-1 to 4-7. In defining the Project Area for purposes of evaluating cumulative impacts, the FEIS failed even to demarcate, let alone analyze, the foreseeable impacts to regional eagle and other avian (and bat) species due to wind energy projects and other reasonably foreseeable actions affecting local area populations of these species. Although WAPA pointed to four reasonably foreseeable wind projects located within fifty miles of the Project, the agency limited its examination of those projects to cumulative impacts to *visual and recreation resources*. Thus, WAPA did not evaluate cumulative impacts with respect to other important resources, such as the local area population of eagles, migratory birds, or other federally protected and/or regionally significant wildlife species. Nor did WAPA evaluate cumulative impacts to historic and cultural resources, even though the regulations

implementing Section 106 of the NHPA explicitly require consideration of cumulative effects. 36 C.F.R. § 800.5(a)(1).

85.    Despite previously informing the ACC that it would consider its comments—which WAPA received months before issuing its FEIS, thus allowing the agency ample opportunity to respond to the ACC's comments—WAPA ultimately failed to include those in Appendix C to the FEIS, which lists and responds to concerns raised in response to the DEIS. Nor did WAPA respond to any of the substantive concerns raised by the ACC's comments, as indicated above. To date, those concerns remain completely unaddressed.

86.    On November 23, 2021, the ACC submitted a letter to WAPA raising concerns with the FEIS that mirrored the issues the ACC had previously raised with respect to the DEIS.

87.    On December 13, 2021, the ACC sent another letter, specifically identifying concerns regarding the ACC's still-existing serious problems with WAPA's failure to adequately examine cumulative impacts under NEPA and the NHPA, which the ACC intended WAPA to consider prior to making a final decision and issuing a ROD. There, the ACC identified several reasonably foreseeable actions—including two wind projects—that the FEIS did not even mention.

88.    On April 11, 2022—prior to the issuance of a ROD—the ACC sent another letter to WAPA, identifying serious concerns to the local area population of bald and golden eagles due to the anticipated effects of this Project, in combination with cumulative effects from other existing and foreseeable wind energy projects in the region. In particular, the ACC highlighted a recent eagle mortality at the Roundhouse Wind Project, which is located only eight miles from the Rail Tie Wind Project.

### 4.  *Record of Decision*

89.     Three months after the ACC's last correspondence, WAPA Administrator Tracey Lebeau signed the ROD authorizing the Project's interconnection on July 11, 2022. The ROD was published in the Federal Register eight days later. *See* 87 Fed. Reg. 43,022, 43,022-28 (July 19, 2022).

90.     The ROD is disingenuous when characterizing the thrust of WAPA's decision. After saying nothing to this effect in its scoping notice, DEIS, or FEIS, WAPA's ROD implies that WAPA may only "deny an interconnection request" if "operation of the power system would [] be negatively affected," the applicant declines to fund "any necessary system upgrades," or "existing power customers would [] be impacted," ROD at 3. However, the ROD inexplicably and arbitrarily omits the terms of its own Tariff, which authorizes WAPA to deny an interconnection request based on the findings of its NEPA review. *See* Tariff, Attach. L at 44 ("[WAPA]'s NEPA review could result in a decision not to execute the [Large Generator Interconnection Agreement (LGIA)], or to delay LGIA execution."]. The ROD also selectively fails to mention that WAPA retains discretion to "negotiate[]" and adopt mitigation measures—through consideration of reduced-impact alternatives—and that WAPA may deny an interconnection request in the absence of "a commitment from the applicant that its proposed mitigation will be implemented." Guidance, Attach. E at 5. Indeed, WAPA's guidance explains that "[a]n EIS usually contains mitigation that will lessen certain impacts," including "avoiding impacts by not taking certain actions; minimizing impacts by limiting the degree of magnitude of the action; [and] rectifying the impact by repairing, rehabilitating or restoring the affected environment . . . ." *Id.*, Attach. E at 4-5.

91.     The ROD reiterates the FEIS's head-scratching defense of its unreasonably slender alternatives analysis—claiming on one hand that without WAPA's interconnection

agreement, "the Project would not be built," while also claiming that the Project's "operation" does not involve any "participation" by WAPA and, therefore, "could proceed regardless of WAPA's involvement." ROD at 4, 6-7.

92.    The self-serving logic underpinning WAPA's alternatives analysis is also on full display in the ROD's selection of the "environmentally preferred alternative," which WAPA identifies as the no-action alternative. *Id.* at 10 ("WAPA has identified the No Action Alternative as its Environmentally Preferred Alternative as none of the identified Project-related impacts would occur, including the potentially significant visual impacts and risk of eagle mortality."). However, as explained, the rationale for WAPA's selection directly conflicts with its reason for excluding the Project as a "major Federal action"—because "ConnectGen's decision to construct [its] Project could proceed regardless of WAPA's involvement if the Project could interconnect with other non-WAPA transmission lines with sufficient available transmission capacity." *Id.* at 7. Given that the Project will purportedly proceed "regardless of WAPA's involvement," it is difficult to understand why "[t]he beneficial impacts of renewable energy generation would also not occur" if the no-action alternative were chosen. *Id.* at 10. Neither WAPA's ROD nor its FEIS explains this patently arbitrary discrepancy.

93.    In its summary of impacts, the ROD concedes that "large wind turbines would result in an obvious man-made change to the existing visual environment that would be seen for a considerable distance," and could pose a threat to nighttime aerial navigation, but concludes that this effect "would be greatly reduced" *if* mitigation measures are approved by the Federal Aviation Administration. *Id.* at 7-8. The ROD fails to explain whether such impacts are acceptable to WAPA in the absence of such mitigation, or whether its approval of the

interconnection request is contingent on the Federal Aviation Administration requiring those mitigation measures and ConnectGen expressly committing to undertake them.

94.    Next, the ROD acknowledges that the Project will have significant visual impacts on historic resources near the Project, including the Ames Monument NHL. *Id.* at 8. Nevertheless, the ROD shrugs off any concern over those effects by pointing to "avoidance, minimization, and mitigation measures" that *might* be imposed through the NHPA process, even though that process, at the time WAPA issued its ROD, remained ongoing and far from a conclusion. *Id.*

95.    The ROD also recognizes that the Project's construction and operation will result in a "significant" number of eagle fatalities each year. *Id.* ("Preliminary information suggests that there could be multiple eagle fatalities per year resulting from operation of the Project."). Yet, here too, the ROD quickly points to unformulated mitigation measures, including a "spatial buffer around known eagle nests" and ConnectGen's unenforceable promises to prepare "an eagle conservation plan" and apply "for an eagle incidental take permit from the U.S. Fish and Wildlife Service." *Id.* While the ROD goes to great lengths to describe *FWS's* obligations under BGEPA, it conveniently sidesteps any explanation of WAPA's duty under NEPA. Indeed, in both the ROD and FEIS, WAPA never analyzes whether or explains why (let alone how) ConnectGen's hypothetical "eagle conservation plan" will reduce the Project's impacts to eagles. Nor does it ever explain whether anticipated impacts on local eagle populations are acceptable to WAPA in the absence of any defined eagle mitigation measures that are binding on ConnectGen,

or whether its approval of the interconnection request is contingent on those measures being developed and implemented only once FWS has provided its authorization under BGEPA.[5]

96.     In addition to the hypothetical mitigation measures mentioned above, the ROD also makes clear that "[t]he design features, best management practices, and avoidance and minimization measures," which are briefly mentioned in table 2-6 of the FEIS and "incorporated into the Project's committed Environmental Protection Measures," "are considered an integral part of the proposed Project to be implemented by ConnectGen," and "reflect *all practicable means* to avoid or minimize environmental harm from the Project." *Id.* at 5-6 (emphasis added). The ROD, however, fails to explain how WAPA reached this conclusion when the vast majority, if not all, of the measures have yet to be developed.

97.     With respect to cumulative impacts, the ROD briefly addresses two wind energy projects identified by the ACC in its pre-ROD letters. However, as with the FEIS, WAPA only considered in the ROD as part of its cumulative impact analysis how those projects would affect certain resources such as public health and safety, social and economic, and transportation resources. WAPA neither considered cumulative *environmental* impacts (such as those to the local area population of bald and golden eagles), nor explained why it excluded environmental effects from its discussion of cumulative impacts. WAPA also failed to consider cumulative impacts to historic and cultural resources.

---

[5] On information and belief, FWS has not begun processing—let alone issued—an incidental take permit under BGEPA for ConnectGen/Repsol in connection with this Project. Until and unless such a permit is issued, the Project proponent seriously threatens to violate BGEPA through construction and/or operation activities that could disturb, harass, kill, or otherwise take bald or golden eagles. This is why obtaining a permit *before* Project construction commences is essential; such a permit will invariably require siting modifications to avoid or reduce harm to eagles, which must be incorporated into any project design before the start of construction.

98.     According to WAPA's project website—with the exception of the NHPA consultation documents discussed below—WAPA evidently has not conducted (or at least publicly disclosed) any of the myriad resource impact reports and studies that it promised would occur, albeit without public comment and meaningful involvement, after WAPA issued the ROD. *See* WAPA, Rail Tie Wind Project, https://www.wapa.gov/ transmission/transmission-environmental -review-nepa/rail-tie-wind-project/.

99.     In October 2024, WAPA published a cursory "Mitigation Action Plan" on its project website. That plan "summarizes the measures documented in the [ROD] and [HPTP] to mitigate potential adverse environmental impacts of the [Project]." While asserting erroneously that "[e]nvironmental protection measures that are integral to the Project . . . were evaluated in the EIS," the Mitigation Action Plan acknowledges that ConnectGen has not yet developed the plans necessary to mitigate the Project's impacts—i.e., WAPA references "the plans ConnectGen *will* develop for implementing [] protection measures . . . to avoid or minimize adverse environmental impacts," and notes that this Plan "may be revised as more specific and detailed information becomes available." The entirety of the "Plan" for mitigation action by WAPA and ConnectGen consists of a half-page table summarizing high-level (rather than site-specific) mitigation strategies such as at least "one-mile spatial buffer[s] around known eagle nests," and "[p]repare an eagle conservation plan." Nowhere in this brief "plan" does WAPA explain in any detail how each mitigation measure "will be planned and implemented," as required "before DOE takes any action directed by the ROD that is the subject of a mitigation commitment." 10 C.F.R. § 1021.331(a). Nor is this plan "as complete as possible." *Id.* § 1021.331(c).

### D.    WAPA's Section 106 and 110(f) Processes Under the NHPA

#### 1.    *The Ames Monument NHL*

100.    The Ames Monument NHL is a unique and nationally significant Landmark, which was constructed on the highest point of the engineering marvel that is the transcontinental railroad, and to highlight key figures involved in construction. The large, granite pyramid represents a pivotal and unique moment in the history of American design, and embodies a nationally iconic story of transportation, politics, engineering, and economics.

101.    The Ames Monument NHL, so designated as an NHL by the Secretary of the Interior on October 31, 2016, was constructed between 1881 and 1882. The Monument is a memorial to the Ames Brothers of Massachusetts and their role in building the Union Pacific Railroad, designed by the prominent American architect, H. H. Richardson, and built by Norcross Brothers of Worcester, Massachusetts. The Ames Monument is also a State Historic Site and commemorates the highest point on the Union Pacific Railroad, which was the first transcontinental railroad. The Ames Monument NHL is listed in the NRHP under Criteria A and C, and was designated an NHL for its national significance; the integrity of setting, feeling, and association are important characteristics of this resource.

#### 2.    *The 2021 Programmatic Agreement*

102.    In July 2021, WAPA and other signatories executed a PA to govern the consultation process required for the Project pursuant to Sections 106 and 110(f) of the NHPA. Among other stipulations, the PA asserts that "WAPA lacks authority over Applicant's proposed Project, including electrical generation methods, selection and siting of equipment, and construction and operation of the proposed Project." PA, ¶ 4. The PA identifies at least 478 historic properties located within the APE, including the Ames Monument NHL and several

National Historic trails. *Id.*, ¶¶ 10-13. The PA explains that ConnectGen "is committed to implementing environmental protection measures to reduce direct and indirect impacts to cultural resources, such as, reducing visual impacts when designing the layout of structures, buildings and infrastructure, using setbacks to avoid direct disturbance" to historic properties. *Id.*, ¶ 21; *see also id.*, ¶ 20 (stipulating that ConnectGen "will fund all . . . measures agreed upon through consultation, to avoid, minimize or mitigate potential adverse effects to historic properties"). The PA stipulates that, "[i]f WAPA determines that the undertaking will have adverse effects on historic properties, WAPA shall consult with SHPOs, consulting parties and Indian tribes to develop and evaluate adjustments or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects to those properties." *Id.*, § IV.A. With respect to Section 110(f), the PA states that "WAPA will advise the Applicant, to the maximum extent possible, on planning and actions that may be appropriate to minimize adverse effects to the Ames Monument NHL that may be caused by the undertaking (36 CFR § 800.10)." *Id.*, § IV.B. The PA further stipulates that "WAPA, through the Applicant, will resolve adverse effects on historic properties through the development and implementation of one or more HPTP," which will "provide specific avoidance, minimization, or mitigation measures, commensurate with the adverse effects, including cumulative effects, that may be caused by the undertaking." *Id.*, § IV.C.

103.    For the HPTP, the PA requires that it "will be prepared in consultation with SHPO, consulting parties and Indian tribes." *Id.*, § IV.C.1. The PA requires WAPA and the Applicant to "consult with the consulting parties to determine HPTP content and specific treatment or mitigation proposed for the historic properties or groups of historic properties adversely affected." *Id.*, § IV.C.2. Under the PA, WAPA must "provide the HPTP to the

consulting parties" for review once the "HPTP is completed and accepted by WAPA," and "WAPA will take all comments into account and request of the Applicant to revise the HPTP, as appropriate." *Id.* The PA explains that "WAPA will endeavor to reach consensus on the HPTP, but if the consulting parties fail to resolve adverse effects in a reasonable timeframe, WAPA will comply with 36 CFR § 800.7 and seek ACHP comment and move forward accordingly." *Id.* The final HPTP must "identify each specific historic property or group of historic properties that will be adversely affected and cannot be avoided." *Id.*, § IV.C.3.

### 3. Post-PA Development of the HPTP

104.    The ACC formally requested to become a consulting party in WAPA's NHPA consultation process for the Project in November 2021; WAPA granted that request. Almost immediately upon becoming a consulting party, the ACC began identifying serious concerns with WAPA's ongoing consultation process under the NHPA.

105.    In February 2022, for example, the ACC notified WAPA that the agency's consultation process "appears designed to exclude meaningful participation by consulting parties and interested stakeholders." In that letter, the ACC explained that "interested stakeholders have not been granted reasonable opportunities to speak on the record as part of the NHPA process regarding their concerns with the overall approach to avoiding, minimizing, and/or mitigating impacts to historic and cultural resources." The ACC noted that other consulting parties, such as the Albany County Historic Preservation Board, had raised similar concerns with both the process and substance of WAPA's NHPA consultation. The ACC also stated that it was "especially troubled by the lack of consideration by WAPA to date regarding its duty to consider alternative configurations of the proposed Project that would avoid, or at least minimize, effects to the Ames [Monument] NHL and other historic and cultural resources in the area," particularly

in light of "the heightened burden in this instance under Section 110(f) of the NHPA that applies directly to the Ames [Monument] NHL." The ACC also explained that, "despite WAPA's representation that avoidance of effects to the Ames [Monument] NHL is the preferred approach (instead of mitigation of effects), WAPA has neither explained its laser focus on mitigation in lieu of avoidance, nor has it explained why, in the agency's view, avoidance of effects on the Ames [Monument] NHL is not feasible." The ACC's letter also emphasized that "WAPA has not remotely satisfied its legal obligations . . . to consider the cumulative impacts to historic and cultural resources when the effects of the proposed Project are added to the effects of reasonably foreseeable wind projects slated for construction in the same region." (citing 36 C.F.R. § 800.5(a)(1)).

106.    In January 2023, the Wyoming State Historic Preservation Office ("SHPO") sent a letter to the ACHP, which explained that "this consultation is not being held in good faith and [SHPO] is concerned about the direction of the process." The Wyoming SHPO stated that "[i]t is troubling that the majority of concerns and issues raised by SHPO, Tribes, and other consulting parties have been regularly dismissed by WAPA with little to no discussion."

107.    Also in January 2023, the Wyoming State Parks, Historic Sites, and Trails ("SPHST")—which manages the Ames Monument NHL—determined that "the proposed mitigation package [from WAPA] for the Rail Tie wind project [is] inappropriate and seriously lacking for the adverse effect under consideration" because "[t]he three options presented do not sufficiently address the adverse impacts to the resources of concern, undervalue the importance of the [Ames] National Landmark and are not options that are of interest to Wyoming State Parks for mitigation." Wyoming SPHST "recognize[d] that work has been done to relocate turbines at

a further distance from the Ames Monument NHL; however, there is still a sizable adverse impact" to the NHL.

108.    In March 2024, the ACC—in its role as a consulting party to the NHPA consultation process—submitted comments to WAPA on the agency's draft HPTP that must set forth measures to avoid, minimize, and mitigate the Project's impacts to the Ames Monument NHL and other affected historic properties and cultural resources. For these comments, the ACC enlisted "the independent expertise of Mary Hopkins, who previously served as the Wyoming State Historic Preservation Officer—i.e., the highest position in the Wyoming State Historic Preservation Office"; the ACC explained that "Ms. Hopkins has extensive training and expertise in evaluating the historic and cultural significance of resources in Wyoming." Among other comments, the ACC (and Ms. Hopkins) urged WAPA to "be more specific on the actions that WAPA has taken to [avoid and] minimize harm to the Ames Monument [NHL]," where "[t]he Monument is being adversely affected by this action." Specifically, the ACC asked, "[w]hat requirements and requests have been made of the proponent to reduce this effect so it is no longer adverse?" And the ACC "encourage[d] WAPA to require turbines be placed more than 2 miles from the NHL, as this measure could reduce [effects] and protect this nationally important resource." The ACC noted that "[t]urbine locations are not provided to the consulting parties and should be included in the documentation." Further, the ACC emphasized that "[a] 2-mile setback is not adequate to protect the [Ames] NHL." In the same comment letter, the ACC also raised specific objections to WAPA's proposed mitigation treatment measures.

109.    Other consulting parties also expressed their extreme frustration with WAPA's consultation process. In March 2024, for example, the Albany County Historic Preservation Board send WAPA a letter, stating that "we cannot say it loud enough, we do not feel that we are

being consulted in a meaningful manner." The Board also explained that "the HPTP is treating all of the measures as a one off payment that is not in alignment with the impact of this ~35 year project on the area"; this is, in part, because "[n]one of the mitigations actually deal with the actual visual impact of this project on the Ames Monument [NHL] other than the 2 mile setback which still leaves the turbines destroying the visual impact from the monument on the Laramie Valley." The Board thus asked, "does ConnectGen honestly believe that $230,000 is going to allow any party to develop meaningful historic preservation initiatives to offset the impact [of this Project to the Ames Monument NHL]?" The Board further stated that "[i]t is also our opinion that WAPA and ConnectGen are making the decisions on mitigation, not the consulting parties"; "[t]his is deduced from the lack of meetings with the consulting parties as well as the comments in the column marked WAPA / ConnectGen Response."

110.    Petitioner Wyoming Association of Professional Archaeologists also wrote in March 2024, reiterating many of the concerns shared by other consulting parties. Its letter raised concerns about "the appearance of the project sponsor buying their way through the Section 106 process"; the need for "the specific uses of these [proposed mitigation] funds [to] be set forth in the [HPTP] so the monies are not spent on other projects or needs not associated with this mitigation"; and "[t]he amount [of mitigation money] proposed in the treatment plan is so low it will not allow the development of meaningful historic preservation initiatives to offset the impact today let alone over the approximately 35 year length of the proposed Rail Tie project." The letter concluded: "[o]verall the treatment plan is too vague for us to be assured of what will be ultimately accomplished in terms of addressing such issues as funding preservation and maintenance of the Ames Monument and funding work at other historic resources in this area";

"[t]he administration of the funding and the lack of consideration of such economic changes, such as inflation, have not been adequately addressed to protect the cultural resources."

111.    In May 2024, the ACC, the Albany County Historic Preservation Board, and other consulting parties urged WAPA in various letters to adopt mitigation measures that will be located in or near the Project's area of effect, including a new Migrations Museum in Tie Siding, Wyoming, which is located "in the center of the APE for this project and is on Highway 287, the major highway from Ft. Collins, Colorado to Laramie, Wyoming"; "[i]t is along the corridor of the Cherokee and Overland Trail, the Lincoln Highway and the Union Pacific Railroad." This route "has been a migratory corridor for over 10,000 years." WAPA ultimately rejected this measure (and many others) without any coherent justification or explanation as to why.

112.    In June 2024, Wyoming SPHST—the administrator of the Ames Monument NHL—wrote WAPA, expressing concern and criticism with the HPTP development process. For instance, SHSPT explained that "it is generally our practice to encourage commitment to a mitigation strategy or idea rather than its cost, with a preference for on-site mitigation." It noted that "SPHST has been pressured to provide ideas and costs, and we have received criticism from our partners for complying and providing monetary estimates." Most importantly, SPHST explained that "[w]e do not consider the lack of commitment to the idea of an exterior exhibit plan and execution, or the final [dollar] number proposed by ConnectGen/Repsol that is to be included in the [HPTP], to be adequate mitigation for the visual disruption to a National Historic Landmark, especially when setting is specifically referenced as a contributing characteristic." SPHST "reiterate[d] that" WAPA and ConnectGen must adopt "mitigation measure[s] commensurate with the adverse effects caused by the undertaking," noting that "[t]he cost should be a secondary consideration; however, we want to be clear that we are asking for full funding

for an exhibit plan and execution at the National Historic Landmark, at a cost of $500,000."

Finally, SPHST explained that the mitigation proposed in the HPTP "seems to minimize the

impacts to the at least eighty-one other National Register listed or eligible resources in the area

of potential effects" for the Project. Further, SPHST admonished that "[t]his process has lacked

in collaboration, and our concerns have been relayed repeatedly to WAPA and heard by the

[ACHP] but have not been adequately addressed."

113.    On August 23, 2024, WAPA released meeting notes that, for the first time,

informed consulting parties that WAPA, ConnectGen, and a few select federal and state agencies

met in secret—without even notifying formal consulting parties to the NHPA consultation—on

July 17, 2024; July 31, 2024; and August 20, 2024. At those meetings, the attendees made

crucial decisions about avoidance, minimization, and mitigation measures for the Ames

Monument NHL and other historic properties and cultural resources within the Project's APE.

Despite the PA's explicit requirement that the HPTP "will be prepared in consultation with

SHPO, *consulting parties* and Indian tribes," PA, § IV.C.1 (emphasis added), and a stipulation

that WAPA and ConnectGen must "consult with the consulting parties *to determine HPTP*

*content and specific treatment or mitigation* proposed for the historic properties or groups of

historic properties adversely affected," *id.*, § IV.C.2 (emphasis added), WAPA deliberately

excluded the ACC and many other consulting parties from these three meetings where WAPA

and select stakeholders made important decisions about the level of effect to the Ames

Monument NHL (and other historic properties); a purportedly commensurate level of avoidance,

minimization, and mitigation measures to offset those effects; and the actual terms and costs of

the treatment measures. Not surprisingly, the consulting parties WAPA excluded from these

important meetings and decisions were those who had repeatedly raised serious, legitimate

criticisms with WAPA's consultation process and proposal for resolving effects for this undertaking, suggesting that WAPA excluded these parties (despite the requirements of the NHPA and the PA governing this Project) in order to avoid further criticism and input by relevant stakeholders.[6]

114.    WAPA's email and meeting notes indicated that as a result of its secret meetings, it had selected two treatment measures—i.e., Treatment Measure 1 and Treatment Measure 2. The first measure would require ConnectGen to provide funding to Wyoming SPHST to be spent on that agency's pre-existing list of maintenance and other activities for the Ames Monument NHL. The second measure would require ConnectGen to provide a comparable amount of funding to the Wyoming State Museum—located in Cheyenne, far outside of the Project's APE in Albany County—to create a new exhibit that has little to do with the Ames Monument NHL or other historic properties that will be specifically affected by the Project.

115.    Upon learning about these secret meetings and the exclusion of myriad consulting parties from those meetings, the ACC emailed WAPA and the other consulting parties on August 30, 2024. There, the ACC raised serious concerns regarding the lack of involvement by many consulting parties in important discussions and ultimate decisions about the content of the HPTP and the treatment measures adopted by WAPA, and the grave legal inadequacy of the proposed treatment measures to provide a commensurate level of avoidance, minimization, and mitigation

---

[6] On information and belief, WAPA excluded the following consulting parties from these three important meetings: the ACC; Certified Local Government Albany County Historic Preservation Board; Spenser Pelton, Wyoming State Archeologist; Alliance for Historic Wyoming; Wyoming Association of Professional Archaeologists; National Trust for Historic Preservation; Cheyenne Depot Museum; Jim Davis; Mitch Edwards, Oliver Ames; William Ames; Lincoln Highway Association; and Anna Lee Ames Frohlich. WAPA also excluded Indian tribes from the consultation to develop the HPTP, again in violation of the explicit requirements of the PA, ¶ IV.C.1.

for the severe adverse effects the Project will cause to the Ames Monument NHL and other historic properties in the Project's APE. The ACC explained that, for various reasons, both the process and the proposed treatment measures violated Sections 106 and 110(f) of the NHPA, and the regulations that implement those provisions.

116.    On September 4, 2024, the Albany County Historic Preservation Board sent WAPA a letter (accidentally dated September 24, 2024), to "express our extreme disappointment that three meetings were held in which the treatment plan was discussed and planned out with an invitation extended to us as the Certified Local Government for the county in which this project resides"; "[w]e consider this an extreme act of bad faith with Albany County." The Board explained its expert opinion that WAPA's actions are "unconscionable" and that the agency's "behavior does not support the requirement for openness and transparency of the [Section] 106 process." With regard to the treatment measures WAPA adopted without the benefit of discussion among, or feedback from, all consulting parties, the Board raised serious objections to the open-ended, unrestricted nature of the funds ConnectGen would pay to Wyoming SPHST under Treatment Measure 1, noting that most of the proposed uses of those funds would not "in any way mitigate[] adverse VISUAL Project effects," as required by Sections 106 and 110(f) of the NHPA. The Board also objected to Treatment Measure 2, stating:

> Treatment measure 2 we find as completely unacceptable. The Wyoming State Museum is in Laramie County nowhere near the area of impact for this project. You state that this funding will serve as mitigation of adverse visual Project effects. This project has nothing to do with the adverse visual Project effects. Nor does it benefit Albany County which is the location where these effects will be felt.

The Board explained that "[w]e also believe that this funding is more appropriate in expanding the area of Ames Monument to include the site of Sherman" because "the preservation of the town of Sherman is a better visual mitigation of this project." Thus, the Board concluded, "[w]e

do not believe that any funding for mitigation should be spent outside of the area of impact or Albany County."

117.    At a September 6, 2024 meeting of consulting parties, WAPA confirmed that it had decided—without the benefit of all consulting parties being allowed to participate—to adopt only two very modest treatment measures (Treatment Measure 1 and Treatment Measure 2). The first measure would provide unrestricted funding to Wyoming SPHST (up to $350,000, which was far less than SPHST's original request for at least $500,000 in funding to mitigate Project effects), to be spent on that agency's pre-existing list of maintenance and other activities for the Ames Monument NHL. The second measure would provide a comparable amount of funding to the Wyoming State Museum in Cheyenne—far outside of the Project's APE in Albany County— to create a new exhibit that has little to do with the Ames Monument NHL or other historic properties specifically affected by the Project. In adopting those two modest measures, WAPA rejected numerous proposals from consulting parties that were designed to meet WAPA's selection criteria while providing far more benefit to the historic properties affected by this Project commensurate to the nature and extent of the Project's impacts to those properties.

118.    On September 17, 2024, WAPA purported to respond to the Albany County Historic Preservation Board's letter. There, WAPA acknowledged that it held meetings with some—but not all—consulting parties to avoid transparency and "criticism" of treatment measure proposals and costs, even though an open process subject to dialogue is precisely what the NHPA prescribes to ensure compliance with the law. While admitting that the NHPA "requires [WAPA] to seek ways to avoid, minimize, or mitigate adverse effects on historic properties," WAPA cursorily stated, without any explanation, that "TM 1 and TM 2 are commensurate with the nature and magnitude of the Project[']s visual adverse effect on the NHL

and other historic properties and are adequate for addressing the historic properties visually affected by the Project, provide public benefit, and are reasonable in terms of scope and costs"; "WAPA additionally finds these measures balance the goals and objectives of the undertaking with the intent of NHPA Section 110(f) without requiring undue costs."

119.    Also on September 17, 2024, WAPA released a "matrix" of consulting party comments made during the September 6, 2024 meeting, and WAPA's responses to those comments. Notably, WAPA acknowledged that, although WAPA has an obligation under the NHPA to ensure that any avoidance, minimization, and mitigation measures ultimately adopted are commensurate with the level of the Project's effect on the Ames Monument NHL and other historic properties, WAPA deferred to the Project proponent and Wyoming SPHST to "work out the details of TM 1," including "[t]he funding amount" that those parties negotiated without the involvement of WAPA or other consulting parties. Despite the Project proponent's public statements that the Project entails at least a $500 million capital investment and the fact that this Project will foreseeably result in severe adverse effects to the Ames Monument NHL and other historic properties, WAPA explained in the response matrix that the HPTP would only require the Project proponent to pay a mere "not-to-exceed amount of $350,000, as agreed upon by SPHST and Repsol" for TM 1. WAPA noted that "[t]he funding amount for TM 2 is yet to be determined but is anticipated to be on the same order of magnitude as the not-to-exceed amount for TM 1," to be subsequently "agreed on between Repsol and the State Museum." Thus, even if ConnectGen (now owned by Repsol) ultimately agrees to fund TM 1 and TM 2 at the highest amounts contemplated by WAPA, it would represent, *at most*, only 0.14% of the Project's capital costs.

120.    On September 18, 2024, the Alliance for Historic Wyoming—a consulting party listed in the PA—sent a letter to WAPA reiterating many of the concerns repeatedly raised by the ACC and other consulting parties. For example, the Alliance objected to TM 2, explaining that "this proposed treatment measure encompasses interpretation of the entire state with little emphasis on the region this project is impacting," and thus "is largely irrelevant to the cultural resources directly impacted by this project." The Alliance explained that it is "also concerned that a dollar figure for the exhibit has not been specified in the proposal, as cost/reasonability is one of WAPA's selection criteria." The Alliance therefore "discourage[s] [WAPA] from considering this Treatment Measure as mitigation of adverse visual effects by the project, and would encourage more meaningful consultation on the development of Treatment Measure 2." For this reason, the Alliance "continue[s] to maintain that the mitigation option of an exhibit at the State Museum is insufficient in minimizing the adverse impacts on the cultural landscape."

121.    On September 20, 2024, WAPA purported to respond to the Alliance's concerns. There, "WAPA clarifie[d] that there are no direct physical Project effects to the adversely affected historic properties; only visual Project effects were not fully avoidable." WAPA did not explain why severe adverse visual effects to the Ames Monument NHL and other historic properties—which are indisputably "direct" effects as that term is construed under Section 110(f) of the NHPA—somehow diminishes WAPA's obligation to avoid and minimize (or, if avoidance is shown to be impossible, at least seriously mitigate) these direct adverse effects in a manner commensurate with the level of effect, in order to comply with the NHPA. Nor did WAPA explain what avoidance measures had been adopted or why Project effects could not be further avoided or at least minimized before turning to less preferred mitigation of adverse effects.

122.    On September 23, 2024, the ACC sent a letter to WAPA continuing to raise concerns both with WAPA's problematic consultation process and the treatment measures ultimately adopted by WAPA, explaining that WAPA's actions failed to comply with the NHPA and its regulations. On September 24, 2024, WAPA responded to the ACC's letter, largely reiterating the responses it provided a few days earlier to the Alliance for Historic Wyoming.

### 4.    WAPA's Final HPTP

123.    On September 26, 2024, WAPA provided consulting parties with the finalized, signed HPTP for the Project.

124.    In the HPTP, WAPA asserts that "[t]his HPTP provides specific treatment measures to avoid, minimize, or mitigate adverse effects, including cumulative effects, which may be caused by the undertaking." HPTP at 2. WAPA also points to measures "to avoid or minimize physical and visual impacts to cultural resources," "includ[ing] a minimum 2-mile setback from the Ames Monument NHL, to reduce visual impacts when designing the layout of structures, buildings, and infrastructure." *Id.* Without explanation, the HPTP asserts that "[i]mplementation of this HPTP will mitigate adverse visual effects on historic properties and further minimize harm to the NHL," *id.*, and will ensure that "no historic properties will be physically affected by the Project." *Id.* at 3.

125.    As to the Ames Monument NHL, WAPA explained in the HPTP:

> [I]ntroduction of the turbines would tend to *dominate the setting of the historic property and would result in a strong visual contrast to the existing landscape of the Ames Monument NHL* . . . . As a result, *the Project will alter the setting and feeling of the landscape as viewed from the NHL to the extent that it will no longer reflect the open, generally unobstructed view from the NHL, resulting in an adverse visual effect to this historic property*.

*Id.* (emphasis added). Despite these indisputably severe effects to the Ames Monument NHL, and while acknowledging the "special protection requirements for the Ames

Monument NHL under Section 110(f) of the [NHPA]" and the NHL's "exceptional value in commemorating or illustrating the history of the United States," the primary avoidance measure WAPA pointed to was its "recommend[ation] that Applicant maintain a 2-mile setback for Project turbines from the NHL." *Id.* Nowhere did WAPA explain why a relatively nominal 2-mile setback constituted a reasonable and legally sufficient effort to avoid Project effects to the Ames Monument NHL, let alone explain how such a minimal setback (especially compared to much larger setbacks for wind energy projects recently approved by other federal agencies) is either commensurate with the Project's severe effects to this NHL or complies with Sections 106 and 110(f) of the NHPA.[7]

126.    In the HPTP, despite serious concerns raised by various consulting parties leading up to the HPTP's finalization, WAPA adopted the same treatment measures (TM 1 and TM 2) that were roundly criticized by consulting parties as legally insufficient under the NHPA. Inexplicably, WAPA asserts that "Treatment Measure 1 is specifically for mitigation of adverse visual effects to the Ames Monument NHL," even though it will merely fund pre-existing "preservation and repair needs" rather than actually avoiding or minimizing (let alone mitigating) the impacts of *this* Project. *Id.* at 4. Likewise, WAPA asserts that "Treatment Measure 2 mitigates adverse visual effects to historic properties, including Ames Monument NHL," *id.*, even though the new museum exhibit will be located dozens of miles from the NHL and does not

---

[7] For example, WAPA's sister agency—the Bureau of Land Management—recently conditioned its authorization of another commercial-scale wind energy project on the project proponent, in order to comply with the NHPA, reducing the project footprint by 50% and building no turbines within 9 miles of the Minidoka National Historic Site in Idaho that, like the Ames Monument NHL, is a unique part of our nation's history. *See* Bureau of Land Mgmt., *BLM Issues Final Environmental Review for Proposed Lava Ridge Wind Project* (June 6, 2024), https://www.blm.gov/press-release/blm-issues-final-environmental-review-proposed-lava-ridge-wind-project.

even purport to avoid, minimize, or mitigate Project impacts to the NHL. As to other historic properties and cultural resources that the Project will adversely affect, WAPA similarly asserted that Treatment Measure 2—again, located far outside the Project's APE—will somehow avoid, minimize, and mitigate "adverse visual effects" to those properties and resources. *Id.* at 4-8.

127.    The HPTP explains the three criteria that WAPA ostensibly applied in screening proposals to avoid, minimize, and mitigate Project effects under the HPTP: (1) "Direct relation to Project effects/impacts to the historic property"; (2) "Public benefit"; and (3) "Cost/Reasonability." HPTP at 9. The HPTP then describes Treatment Measures 1 and 2, which remained materially unchanged from those discussed at the consulting party meeting on September 6, 2024.

128.    Treatment Measure 1, as described in the HPTP, provides that the "Applicant shall provide a not-to-exceed funding amount of $350,000 to SPHST to support SPHST's historic preservation-related efforts at Ames Monument"; "SPHST may elect to apply this funding, in part or in full, toward the completion of an outdoor exhibit at the NHL, or toward other historic preservation efforts at the NHL relevant to Project mitigation, such as maintenance and repair projects or Historic American Engineering Record/Historic American Landscapes documentation." HPTP at 9. The HPTP claims that "[t]his funding will serve as mitigation of adverse visual Project effects to the NHL." *Id.* The HPTP acknowledges that future "[a]ctivities conducted by the SPHST will be done at SPHST's discretion and SPHST will maintain all legal responsibilities for activities on the NHL," *id.* at 10; in other words, WAPA determined that funding under Treatment Measure 1 *will* mitigate adverse effects to the Ames Monument NHL, without knowing at the time of its determination how SPHST will even use this funding (let alone the final amount of funding), which is entirely within SPHST's "discretion" without any

further consultation by SPHST with WAPA or consulting parties regarding the future use of those funds.

129.    Treatment Measure 2, as described in the HPTP, provides that the "Applicant shall provide a not-to-exceed funding amount, agreed upon with the State Museum Director, to the Wyoming State Museum to financially support the State Museum's development of their planned Exhibit." As with Treatment Measure 1, WAPA asserts that "[t]his funding will serve as mitigation of adverse visual Project effects." WAPA reached this determination despite the fact that the museum exhibit will be located dozens of miles removed from the Project and its APE where the visual effects will disturb the Ames Monument NHL and other historic properties for decades, and the proposed exhibit is not related to this Project or the site-specific effects of this Project to the Ames Monument NHL and other historic properties. And WAPA determined that funding under Treatment Measure 2 will appropriately mitigate adverse effects to the Ames Monument NHL, without even knowing at the time of its determination the final amount of funding for this far-away museum exhibit.

130.    After describing these two treatment measures, the HPTP states that WAPA "finds that the Applicant's commitment to Treatment Measure 1 and Treatment Measure 2, combined, would result in historic preservation efforts that are commensurate with the nature and magnitude of the Project's visual adverse effect to the Ames Monument NHL and other historic properties." HPTP at 12. Nowhere did WAPA explain how it reached this important legal determination (let alone offer evidentiary support), which is necessary to satisfy the agency's distinct legal obligations under Section 106 and Section 110(f) of the NHPA.

131.    WAPA also asserts in the HPTP that it "finds these measures balance the goals and objectives of the undertaking with the intent of NHPA Section 110(f) without requiring

undue costs (ACHP 2002)." HPTP at 12 (citing ACHP, *Section 106 Consultation Involving National Historic Landmarks*, https://www.achp.gov/digital-library-section-106-landing/section-106-consultation-involving-national-historic-landmarks. With respect to this cursory "finding," nowhere did WAPA explain how it determined that these two treatment measures purportedly balanced competing goals and objectives in a manner that complies with the NHPA, nor did it explain what dollar figure, in the context of this Project and its minimum $500 million price tag, would, in fact, constitute "undue costs," as the proper metric for assessing the cost of proposals to avoid, minimize, and/or mitigation Project effects. Nor, for that matter, did WAPA actually apply any "undue costs" or other cost metric to explain why it rejected the adoption of myriad avoidance, minimization, and mitigation measures proposed by consulting parties that could have had much more meaningful, localized benefits (within the Project's APE) that would better protect the Ames Monument NHL and other historic properties from the severe adverse effects from this Project.

## PETITIONERS' CLAIMS FOR RELIEF

### Claim 1 – Violations of WAPA's Tariff and the APA

132.    All allegations set forth above are incorporated here by reference.

133.    By authorizing the Project's interconnection without obtaining a complete description of the Project or its actual impacts on the environment, WAPA's ROD violates the terms of its Open Access Transmission Tariff, and is arbitrary and capricious, in violation of the APA, 5 U.S.C. § 706(2).

### Claim 2 – Violations of NEPA and the APA

134.    All allegations set forth above are incorporated here by reference.

135.    By refusing to consider the entire Project a "major federal action," and instead labeling a significant portion a mere "connected action"—rather than a "direct" or "indirect effect" of WAPA's action—and by failing to coherently explain that decision, WAPA's ROD, and the FEIS on which it relies, violate NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508; 10 C.F.R. part 1021, and is arbitrary and capricious, and an abuse of discretion, in violation of the APA, 5 U.S.C. § 706(2)(A).

136.    By failing to analyze any alternatives other than the proposed action and a no-action alternative, WAPA has failed to analyze a reasonable range of alternatives in violation of NEPA, 42 U.S.C. §§ 4321-4347, and its implementing regulations, 40 C.F.R. parts 1500-1508; 10 C.F.R. part 1021, and acted arbitrarily, capriciously, in an abuse of discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

137.    By failing to demarcate reasonable boundaries for analyzing cumulative impacts to affected resources such as regional populations of eagles, migratory birds, and other wildlife and environmental resources, and by failing to adequately consider and evaluate the cumulative impacts that will foreseeably impact these and other affected resources, WAPA has failed to take a "hard look" at the Project in violation of NEPA, 42 U.S.C. §§ 4321-4347, and its implementing regulations, 40 C.F.R. parts 1500-1508, and 10 C.F.R. part 1021, and its ROD is therefore arbitrary, capricious, an abuse of discretion, and adopted "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

138.    By failing to disclose and analyze myriad significant environmental impacts of the Project, or reasonable alternatives to the Project, and instead deferring such disclosure and analysis to reports that were to be prepared only after the NEPA process has been completed (which apparently have not been prepared), WAPA's FEIS and ROD have failed to "insure that

environmental information is available to public officials and citizens before decisions are made and before actions are taken," 40 C.F.R. § 1500.1(c), in violation of NEPA, 42 U.S.C. §§ 4321-4347, and its implementing regulations, 40 C.F.R. parts 1500-1508; 10 C.F.R. part 1021, and the agency has acted arbitrarily, capriciously, in an abuse of discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

139.    By acknowledging that the Project requires multiple environmental reviews from its sister agencies—including FWS under the Bald and Golden Eagle Protection Act and the Army Corps under Clean Water Act—yet failing to integrate those reviews and/or incorporate any relevant requirement into its own NEPA review before authorizing this Project under federal law, and by failing to obtain the applicant's commitment to undertake specific mitigation measures to reduce or offset impacts that WAPA acknowledges will be significant to the resources under those agencies' jurisdiction, WAPA has violated NEPA, 42 U.S.C. §§ 4321-4347, and the agency's implementing regulations, 40 C.F.R. parts 1500-1508; 10 C.F.R. part 1021, and acted arbitrarily, capriciously, in an abuse of discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

140.    By failing, as the lead federal agency approving this Project, to invite or include agencies with special expertise and/or statutory authority over resources affected by the Project as cooperating agencies in WAPA's EIS process (including the FWS or the Army Corps), WAPA has violated NEPA, 42 U.S.C. §§ 4321-4347, and the agency's implementing regulations, 40 C.F.R. parts 1500-1508; 10 C.F.R. part 1021, and acted arbitrarily, capriciously, in an abuse of discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

141.    By acknowledging a substantial amount of unavailable or incomplete information relevant to reasonably foreseeable significant adverse impacts that is essential to a reasoned choice among alternatives, yet failing either to obtain such information or explain why it cannot do so, WAPA has violated 42 U.S.C. §§ 4321-4347, and the agency's implementing regulations, 40 C.F.R. parts 1500-1508 (including 40 C.F.R. § 1502.22); 10 C.F.R. part 1021, and acted arbitrarily, capriciously, in an abuse of discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

142.    By adopting a cursory and inadequately detailed Mitigation Action Plan, which is required by DOE's regulations implementing NEPA, which fails to explain how each mitigation measure "will be planned and implemented" and that is far from "as complete as possible," WAPA has violated NEPA, 42 U.S.C. §§ 4321-4347, and the agency's own implementing regulations, 10 C.F.R. part 1021, and acted arbitrarily, capriciously, in an abuse of discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

143.    By inexplicably adopting contradictory positions regarding the economic feasibility of the Project in the absence of WAPA's grant of interconnection, WAPA has skewed it analysis of baseline conditions, the comparative effects of the two alternatives analyzed in the EIS, and the classification of the Project as a "connected action" rather than a direct or indirect effect of WAPA's action, thereby violating NEPA, 42 U.S.C. §§ 4321-4347, and the agency's implementing regulations, 40 C.F.R. parts 1500-1508, 10 C.F.R. part 1021, and acted arbitrarily, capriciously, in abuse of discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

144.     By departing, without explanation, from the agency's own longstanding guidance for implementing NEPA in myriad important ways—including by prematurely commencing and concluding its NEPA process, failing to predicate its NEPA review on a well-defined proposed action for the Project after significant Project features have been identified or decided by the applicant, refusing to consider other reasonable courses of action besides merely granting or denying ConnectGen's interconnection request, failing to analyze action alternatives that would impose mitigation measures not previously developed by ConnectGen, failing to await the conclusion of related federal agency processes to incorporate any resulting mitigation measures as mandatory terms of WAPA's own ROD as the lead federal agency, and failing to obtain implementation commitments from ConnectGen prior to ROD issuance regarding mitigation measures necessary to safeguard eagles, historic features, and other affected resources—WAPA violated NEPA, 42 U.S.C. §§ 4321-4347, and NEPA's implementing regulations, 40 C.F.R. parts 1500-1508, 10 C.F.R. part 1021, and acted arbitrarily, capriciously, in abuse of discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

### Claim 3 – Violations of the NHPA and the APA

145.     All allegations set forth above are incorporated here by reference.

146.     By excluding the ACC, the Albany County Historic Preservation Board, Alliance for Historic Wyoming, and many other consulting parties and Indian tribes from important HPTP meetings where consequential NHPA decisions were made regarding the adoption of proposed treatment measures to avoid, minimize, and mitigate the Project's adverse effects on the Ames Monument NHL and other historic properties and cultural resources, WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those

provisions, 36 C.F.R. Part 800, and the PA for this Project (¶ IV.C.1.), and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

147.    By determining that Treatment Measures 1 and 2 will adequately avoid, minimize, and mitigate the severe adverse effects of the Project to the Ames Monument NHL and other historic properties and cultural resources, and by determining that these treatment measures are commensurate with the nature and magnitude of the Project's direct adverse visual effects to the Ames Monument NHL and other historic properties—notwithstanding the lack of details regarding the treatment measures known to WAPA at the time of that determination, including the final amount of funding for those measures and how such funding will ultimately be used; the fact that neither treatment option will or even purports to actually avoid, let alone minimize or mitigate, the visual impacts of the Project on affected properties; and the location of Treatment Measure 2 will be dozens of miles from the Project's APE—WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

148.    By adopting treatment measures in the HPTP—and rejecting other proposals from consulting parties—without applying in any coherent manner WAPA's own stated screening criteria (i.e., direct relation to the Project effects/impacts to the historic property, public benefit, and cost/reasonability), WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA

for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

149.    By rejecting various alternative proposals that would have provided significantly more protection for the Ames Monument NHL and other historic properties and done so at or near the location of the Project's effects to those resources, thereby better avoiding, minimizing, or mitigating the Project's effects to these properties, WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

150.    By failing to explain how it determined that the two adopted treatment measures properly balance competing goals and legal obligations better than proposals it rejected, and by failing to explain coherently what dollar figure, in the context of this Project and its minimum $500 million price tag, would, in fact, constitute "undue costs," WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

151.    By failing to adopt or require a more protective turbine setback than 2 miles from the Ames Monument NHL—despite federal agencies routinely requiring under the NHPA that project proponents implement much greater turbine setbacks from comparably unique historic properties where elective, for-profit energy projects are involved that require federal authorization—and by failing to coherently explain the rationale for rejecting larger turbine

setbacks from the Ames Monument NHL, WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

152.    By assuming that WAPA lacks authority over the applicant's proposed Project for purposes of the NHPA, and by thereby deferring the selection of avoidance, minimization, and mitigation measures to the Project proponent, WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

153.    By failing to demonstrate how WAPA satisfied its heightened statutory obligation with respect to Ames Monument NHL to show that the agency, "to the maximum extent possible undert[ook] such planning and actions as may be necessary to minimize harm to the landmark," WAPA violated Section 110(f) of the NHPA, 54 U.S.C. §§ 306107, the regulations implementing that provision, 36 C.F.R. § 800.10, and the PA for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

154.    By failing to apply the three-part test for undue costs as set forth in the National Park Service's guidelines that implement Section 110(f) of the NHPA, WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA for this Project, and acted arbitrarily, capriciously, in

abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

155.    By failing to adopt avoidance and minimization measures—let alone mitigation measures—that are commensurate to the severe effects of the Project, and by doing so in reliance on WAPA's arbitrary characterization of the Project's effects as "only visual Project effects" but not "direct physical effects," WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

156.    By failing to consider—let alone analyze—reasonably foreseeable cumulative impacts to the Ames Monument NHL, other historic properties, and cultural resources that will be affected by the Project, including effects from existing or proposed wind energy projects in the region, WAPA violated Sections 106 and 110(f) of the NHPA, 54 U.S.C. §§ 306107, 306108, the regulations implementing those provisions, 36 C.F.R. Part 800, and the PA for this Project, and acted arbitrarily, capriciously, in abuse of its discretion, and "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(A), (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully request that this Court:

(1)    Declare that WAPA's ROD, FEIS, and HPTP for the Project, which authorize the interconnection of the Project as described herein, violate NEPA, its implementing regulations, DOE's own implementing regulations, WAPA's Open Access Transmission Tariff, the NHPA, its implementing regulations, the PA, and the APA;

(2)      Set aside and remand the ROD, FEIS, and HPTP for the Project pending the

preparation of analysis consistent with the requirements of NEPA, the NHPA, and the APA;

(3)      Enjoin WAPA from authorizing interconnection of the Project until the agency

has fully complied with all of its obligations under NEPA, the NHPA, and the APA;

(4)      Award Petitioners their attorneys' fees and costs, pursuant to 28 U.S.C. § 2412,

54 U.S.C. § 307105, and/or other applicable provisions of law; and

(5)      Grant Petitioners such other and further relief that the Court may deem just and

proper.

Respectfully submitted this 23rd day of December, 2024.

*/s/ Ryan A. Semerad*
Ryan A. Semerad
WSB # 7-6270
The Fuller & Semerad Law Firm
242 South Grant Street
Casper, WY 82601
(307) 265-3455
Fax: (307) 265-2859
semerad@thefullerlawyers.com

William S. Eubanks II
(Admission *pro hac vice* forthcoming)
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(970) 703-6060
bill@eubankslegal.com

Matthew R. Arnold
(Admission *pro hac vice* forthcoming)
EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
(843) 718-4513
matt@eubankslegal.com

*Counsel for Petitioners*
