FILED

3:43 pm, 11/13/25

Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

**ALBANY COUNTY CONSERVANCY,** et al.,

Petitioners,

vs.

**TRACY LEBAU**, et al.,

Respondents.

Case No. 24-CV-00271-SWS

**ORDER GRANTING PETITIONERS' MOTION TO COMPLETE THE ADMINISTRATIVE RECORD**

**THIS MATTER** comes before the Court on Petitioners' *Motion to Complete the Administrative Record* (the "*Motion*") [ECF No. 29]. The Court, having reviewed the *Motion*, Respondent ConnectGen Albany County LLC's ("ConnectGen") Response [ECF No. 34], Respondent Western Area Power Administration's ("WAPA") Response [ECF No. 35], and being otherwise fully advised in the premises, grants the *Motion*.

The Court finds that the Historic Properties Treatment Plan ("HPTP") constitutes a final agency action under the Administrative Procedure Act ("APA"), [5 U.S.C. § 704], and therefore, Respondents are ordered to supplement the administrative record, to include all documents and materials directly or indirectly considered by the agency in preparing the HPTP in this matter.

## BACKGROUND

In this record review case, the Administrative Record was filed on April 11, 2025. ECF No. 23. This *Motion* addresses several issues concerning the completeness of that Administrative Record. Petitioners, Albany County Conservancy ("ACC") and others, filed their *Petition for Review* [ECF No.1] in December 2024 challenging certain federal agency actions under the National Historic Preservation Act ("NHPA"), the APA, and, less applicable to this *Motion*, the National Environmental Policy Act ("NEPA"). ECF No. 1.

The underlying dispute in this case arises from the Rail Tie Wind Project (the "Project"), a large-scale private wind energy development proposed, constructed, and operated by ConnectGen. ECF No. 29 at 6-7; ECF No. 34 at 2; ECF No. 35 at 1; ECF No. 35-1. ConnectGen seeks to construct the Project on a combination of privately owned and state-owned lands and to interconnect it with an existing high-voltage transmission line operated by WAPA. ECF No 34 at 2 ("ConnectGen will build its Rail Tie Wind Project (Project) on privately-owned and state-owned land."); *see also* ECF No. 29 at 6-7; ECF No. 35-1. WAPA's involvement is limited to its federal authority to approve the Project's interconnection to the electric grid, which in turn triggered the agency's consultation obligations under Section 106 of the NHPA.[1] ECF No. 34 at 2. (…the Project plans to

[1] Section 106 of the NHPA requires federal agencies to "take into account the effect" of any "undertaking" on historic properties prior to approving the expenditure of federal funds or issuing any license, permit, or approval. 54 U.S.C. § 306108; *see also* 36 C.F.R. § 800.1(c) (agency must initiate Section 106 "early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking"). WAPA's Section 106 obligations were therefore triggered by its federal authority to approve the Project's interconnection to the electric grid, a federal "undertaking" within the meaning of the NHPA. *See* ECF No. 35-2 at ¶3 (Programmatic Agreement stating that "WAPA is required to take into account the effects of its undertakings on historic properties; and with regard to this proposed Project, WAPA defines its 'undertaking' as the interconnection").

connect to an existing high voltage electric transmission line owned by the federal government.").

Because the Project is likely to affect historic and cultural resources, federal law, specifically the NHPA, requires agencies to evaluate potential adverse effects and work with consulting parties to develop measures to "avoid, minimize, or mitigate" those effects. 36 C.F.R. § 800.l(c).

In this case, WAPA, as the lead federal agency responsible for approving the Project's interconnection, developed the HPTP to fulfill its obligations under the NHPA. The dispute in this action centers on that HPTP. The HPTP was developed pursuant to Section 106 of the NHPA and the implementing regulations at 36 C.F.R. Part 800, and in coordination with a Programmatic Agreement ("PA") that was developed for the Project. *See* ECF No. 35-2 (PA); *see also* 35-1 (WAPA's Record of Decision on this Project).

WAPA created a PA in 2021 that was executed with the Advisory Council on Historic Preservation[2] and the relevant State Historic Preservation Officers ("SHPOs") in February 2022. *See* ECF No. 35 at 5. ("The PA became effective on February 2022, when it was signed by ACHP."); ECF No. 34 at 2-3 ("To fulfill its responsibilities under the NHPA, the federal government prepared and signed a Programmatic Agreement (PA) in June 2021.").

[2] The Advisory Council on Historic Preservation is an independent federal agency charged with exclusive authority for developing regulations pertaining to Section 106 of the NHPA, 16 U.S.C. § 470f, and ensuring compliance with that Act. *See Valley Cmty. Pres. Comm'n v. Mineta,* 373 F.3d 1078, 1083 n.1 (10th Cir. 2004).

The Record of Decision ("ROD") approving the Project's interconnection was issued in 2022. ECF No. 35-1. The HPTP was developed in consultation with the SHPOs and finalized two years later in September 2024 to implement the PA. ECF No. 35-3 (HPTP). The HPTP describes specific mitigation measures for affected historic properties, including the Ames Monument National Historic Landmark. *See Id*. at 31; ECF No. 29 at 8 ("WAPA signed the Final HPTP in September 2024.").

Petitioners are consulting parties under the NHPA and allege that they, along with other stakeholders, were not properly included in WAPA's decision-making process. ECF No. 1 at ¶4 ("WAPA deliberately excluded the involvement of participating parties in the NHPA-required consultation process, including Petitioner ACC, as well as many other consulting parties."); ECF No. 29 at 7 ("The Petition for Review describes in detail the Section 106/110(f) process conducted by WAPA and the consulting parties, which included two of the Petitioner organizations now before the Court."); ECF No. 35 at 5 ("The Section 106 process involved consultation among Colorado and Wyoming SHPOs, ACHP, and other potentially affected parties.").

Petitioners allege that WAPA and other federal Respondents "acted arbitrarily, capriciously, and unlawfully under Sections 106 and 110(f) of the NHPA and the regulations that implement those provisions, 54 U.S.C. §§ 306107, 306108; 36 C.F.R. Part 800, as well as the 2021 [PA], during its development and ultimate adoption of the HPTP." ECF No. 1 at ¶4.

The Petition in this matter describes that:

> …during crucial junctures in HPTP development, WAPA deliberately excluded the involvement of participating parties in the NHPA-required consultation process, including Petitioner ACC, as well as many other consulting parties. In addition, despite significant criticism of WAPA's proposal for avoiding, minimizing, and mitigating harm to historic and cultural resources (including the Ames Monument NHL), WAPA ultimately adopted an HPTP that arbitrarily and unlawfully fails to comply with the agency's obligations under Sections 106 and 110(f) to avoid and minimize the Project's harm, let alone mitigate that harm, in a manner that is commensurate to the Project's grave, decades-long adverse effects to the Ames Monument NHL and other significant resources.

ECF No. 1 at ¶5. For those reasons, Petitioners allege that "The ROD, FEIS, and HPTP must be set aside and remanded for further decision making consistent with federal law." ECF No. 1 at ¶6.

In seeking to address their claims regarding the HPTP the Petitioners filed this *Motion* contending that the Administrative Record filed by Respondents is incomplete. ECF No. 29; *see also* ECF No. 23 (Administrative Record). Petitioners assert that the missing materials include, at a minimum, the final HPTP itself, all documents considered by WAPA in preparing it, and a privilege log identifying any withheld materials. ECF No. 29 at 9; ECF No. 36 at 2, 10. Petitioners emphasize that the parties agree the Administrative Record lodged by WAPA omits post-ROD evidence, including the Final HPTP and related materials. ECF No. 36 at 3 ("This means that Respondents do not dispute the dearth of post-ROD evidence qualifies as the kind of 'clear evidence' sufficient to overcome the presumption of regularity that ordinarily applies to motions, like this one, to complete (or supplement) the record."). Petitioners argue that these materials are "necessary to enable

judicial review of the final agency actions challenged in the Petition for Review of Agency Action" because they are essential to evaluating WAPA's compliance with the NHPA. ECF No. 29 at 1.

Petitioners move for an order directing the Respondents to produce the Final HPTP and all documents "directly or indirectly" considered in preparing it, along with a privilege log describing any withheld materials. ECF No. 29 at 9. Petitioners contend that inclusion of these materials is required under the APA, Local Rule 83.6, and controlling case law establishing that judicial review must generally be based on the "whole record" before the agency at the time of its decision. ECF No. 29 at 6 (*citing Bar MK Ranches v. Yuetter*, 994 F.2d 735 (10th Cir. 1993)); ECF No. 36 at 9.

Because the NHPA does not provide a private right of action, Petitioners bring their claims under the APA, which requires that the agency action be final for review. All parties agree that the two-part APA test for finality applies here. *See Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (agency action is "final" if it "mark[s] the consummation of the agency's decisionmaking [sic] process" and determines "rights or obligations" or triggers "legal consequences." (internal quotation marks omitted)).

Under the first prong of the APA's finality test, Petitioners contend that the Final HPTP represents the "consummation" of WAPA's NHPA decision-making process. *See* ECF No. 29 at 11; s*ee also* ECF No. 36 at 2. They argue that, upon its execution, WAPA completed its obligations under Sections 106 and 110(f) of the NHPA for the Project, leaving no further consultation or determinations to be made before construction could proceed. ECF No. at 36 at 5. Petitioners emphasize that the earlier NEPA-based ROD,

issued in 2022, addressed only environmental review and did not finalize the NHPA consultation process. *Id*. at 2 ("WAPA argues that bureaucratic decisions it made to satisfy the agency's statutory obligations under the NHPA in 2024 cannot be reviewed by this Court because the agency previously issued a different final decision to comply with a different statutory obligation (under the National Environmental Policy Act (NEPA)) in 2022, i.e., more than two years before it issued the final HPTP.").

Accordingly, Petitioners assert that the Final HPTP constitutes final agency action under the APA, and that the Court should compel production of the complete administrative record, including any withheld materials reflected in a privilege log. *See* ECF No. 36 at 2; ECF No. 29 at 2 ("The HPTP marks the consummation of WAPA's NHPA decision-making process and legal consequences flow from it. Hence, under controlling authority, the HPTP is a final agency action subject to review under the APA."). Petitioners also point out that nothing in the record, or elsewhere, suggests any further consultation under the NHPA is expected or required by law. *Sackett v. EPA*, 566 U.S. 120, 128 (2012) ("The mere possibility that an agency might reconsider in light of informal discussion and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal.") (quotations omitted).

According to Petitioners, the Final HPTP fulfills commitments made in both the 2021 PA and the 2022 ROD to later identify and resolve the Project's adverse effects on historic properties. ECF No. 35-3 at 4 ("This Historic Properties Treatment Plan (HPTP), which is Appendix C of the PA, was developed pursuant to stipulation IV of the PA (HPTP Development and Resolution of Adverse Effects) for resolution of adverse effects on

historic properties. This HPTP provides specific treatment measures to avoid, minimize, or mitigate adverse effects, including cumulative effects, which may be caused by the undertaking.").

In support of their *Motion*, Petitioners also point to the holding in, *Tohono O'odham Nation v. U.S. Department of the Interior*, 138 F.4th 1189 (9th Cir. 2025). There, the court held that a post-ROD action taken to fulfill the agency's Section 106 obligations under the NHPA constituted final agency action because it reflected the agency's final determination that the PA requirements had been satisfied, allowing the project to proceed. *Id*. at 1201–02. The court rejected the government's argument that the ROD issued under NEPA was the only final agency action that was relevant to the claims in that case, reasoning that the ROD could "not decide whether the PA requirements had been satisfied" because "the identification and evaluation process provided in the PA ... [was] completed after the ROD..." *Id*. at 1201.

Petitioners contend that the same is true here: the PA provides that satisfaction of its terms, including preparation of the HPTP to resolve all adverse effects to historic properties, constitutes WAPA's compliance with Sections 106 and 110(f) of the NHPA. *See* ECF No. 29 at 2. Because the HPTP postdates the ROD, Petitioners argue that "the ROD could not have marked the consummation of the agency's NHPA process under the PA" [ECF No. 29 at 18] since "that process was incomplete when the ROD was issued." *Id*.; *see also* ECF No. 35-1 at 13 ("requirements of the HPTP and PA must be completed prior to any Project ground-disturbing activities that could affect listed or eligible cultural resources."). Petitioners thus maintain that until completion of the HPTP, WAPA had not

fully completed its NHPA obligations. *See* ECF No. 29 at 12–13. Therefore, they contend, that the HPTP marks the consummation of the relevant agency action and satisfies the first step for finality under the APA.

Under the second prong of the APA's finality test, Petitioners contend that the Final HPTP determines legal rights and obligations and carries immediate legal consequences. *See* ECF No. 29 at 13-14; *see also* ECF No. 36 at 8–9. Petitioners argue that the HPTP obligates WAPA and the Project proponents to implement specific avoidance, mitigation, and minimization measures for historic properties affected by the Project, and that it conclusively establishes which measures will be applied and which will not. *See* ECF No. 29 at 13.

Petitioners further maintain that this conclusion is supported by Intervenor ConnectGen's own filings. *See* ECF No. 29 at 13 *(citing* ECF No. 16 (ConnectGen's Motion to Intervene); ECF No. 16-1 (Decl. of Mark Lawlor in Support) ¶ 8 ("The HPTP obligates ConnectGen to provide funding to the Wyoming State Parks, Historic Sites, and Trails for preservation efforts at Ames Monument and the Wyoming State Museum to financially support the State Museum's development of their planned museum exhibit.").

According to Petitioners, these sworn representations to the Court confirm that the HPTP imposes binding, concrete obligations on ConnectGen and WAPA, thereby satisfying the second element of the APA's finality inquiry. *See* ECF No. 29 at 15 ("The HPTP—which consummated WAPA's NHPA decision-making process and allowed Intervenor to proceed with construction—is final agency action subject to review under the APA.").

Petitioners also challenge Respondents' failure to produce a privilege log for any withheld records, arguing that this omission violates Local Rule 83.6. They emphasize that, "[i]nsofar as Respondents believe that privileged documents may be categorically excluded from the record, this Court's Local Rules contain an independent definition of 'the record in proceedings to review agency action' that remains unaffected by out-of-circuit decisions." *See* Local Rule 83.6(b)(1) (governing the '[c]omposition of the record'). Moreover, they argue this Court's Local Rules specifically foreclose any argument that deliberative documents automatically fall outside the record. *See* ECF No. 29 at 15. Petitioners, therefore, urge the Court to order Respondents to provide a complete and compliant privilege log. *Id*.

The Respondents collectively argue that the Petitioners' *Motion* should be denied because the ROD marked the final agency action for NHPA purposes. ECF No. 35 at 1 ("The HPTP is also not an agency action that determines rights or obligations or gives rise to legal consequences; instead, it implemented contractual terms agreed to during the NHPA consultation that culminated in WAPA's ROD."); *see also* ECF No. 34 at 6 ("Instead, the ROD marked the end of the agency's "yes or no decision" on whether to approve the interconnection.").

WAPA in its Response argues "…the HPTPs here are not final agency action…[a]nd, because they post-date the final agency action that WAPA did take in the ROD (approving ConnectGen's interconnection requests), documents related to the HPTP were properly excluded from the administrative record for that final agency action." ECF No. 35 at 15. They go on to argue that the post-ROD documents are therefore irrelevant to

judicial review of WAPA's decision. *See* ECF No. 34 at 4-5 (ConnectGen arguing that "… post-decisional records are irrelevant in determining whether federal law was violated when WAPA approved the interconnection.").

Both Respondents contend that Petitioners' reliance on *Tohono O'odham Nation v. U.S. Dep't of the Interior* is misplaced. ECF No. 34 at 5; ECF No. 35 at 9; 138 F.4th 1189 (9th Cir. 2025). Respondents argue that *Tohono* is materially distinguishable.

In *Tohono* the Ninth Circuit considered limited notices to proceed (LNTPs) issued by BLM after a ROD and PA, where the agency retained authority to authorize construction, and the LNTPs themselves were the final agency action granting rights to the project proponent to begin said construction. 138 F.4th at 1201–02 ("The LNTPs represent the Department's final determination that these requisite conditions have been satisfied. On their face, the LNTPs 'mark the consummation of the agency's decisionmaking [sic] process' … Most importantly, they expressly grant SunZia the right to begin construction in the San Pedro Valley.") (internal citation omitted).

By contrast, Respondents argue that WAPA lacks regulatory authority over the siting, construction, or operation of ConnectGen's project. ECF No. 35 at 10 ("Unlike BLM, which regulates land use, WAPA lacks regulatory authority over ConnectGen's project..."). Respondents further contend that the HPTP does not confer any rights or alter legal obligations, nor does it represent the consummation of any WAPA decision making process. ECF No. 35 at 8. Additionally, they point out that even in *Tohono*, the HPTP itself was not treated as a final agency action; only the LNTPs that authorized construction were. ECF No. 34 at 5 ("*Tohono* did not conclude that an HPTP is a final agency action, nor did

*Tohono* conclude that implementation of a programmatic agreement could be evaluated absent a final agency action."); ECF No. 35 at 10 ("It is also notable that there were HPTPs at issue in *Tohono* as well, and neither the parties nor the court identified them as a relevant final agency action in that case."). Accordingly, Respondents maintain that *Tohono* is inapposite and Petitioners' reliance on said decision is misplaced and does not support supplementation of the administrative record here.

Regarding the privilege log issue raised in Petitioners' *Motion*, only WAPA addresses the arguments in its Response. ECF No. 35. WAPA asserts that the administrative record has been properly compiled and that pre-decisional deliberative materials and post-ROD documents, including the Final HPTP, were not directly or indirectly considered in the agency's decision, so no privilege log is required. ECF No. 35 at 11-15. While WAPA acknowledges that "a foundational requirement for a document to be included in the administrative record is that the documents were directly or indirectly considered by the decisionmaker" [ECF No. 35 at 11-12 (quotation omitted)] they argue that "[d]ocuments reflecting communications and deliberations between agency officials do not fit that bill. Thus, it is relevance that excludes those documents from the record, not that the documents could be privileged." ECF No. 35 at 13 (citations and quotations omitted).

WAPA further contends that no privilege log is required because the HPTP and related post-ROD documents were never "directly or indirectly considered" in WAPA's final decision. ECF No. 35 at 12–13. They contend that, even if some internal materials were not produced, they should not be required to disclose deliberative, pre-decisional

documents. ECF No. 35 at 12 ("It produced an administrative record that properly excluded non-record, deliberative documents. Draft, internal, or deliberative materials are not 'withheld' from the record based on an assertion of privilege."). In particular, WAPA notes that while the Tenth Circuit has not definitively addressed this issue, it relies on *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019), which held that pre-decisional and deliberative documents are not "withheld" under a privilege because they are not part of the Administrative Record to begin with and therefore need not be logged (holding that "agency deliberations not part of the record are deemed immaterial.").

Accordingly, WAPA maintains that the administrative record, as lodged and certified, is complete and complies with both the APA and Local Rule 83.6. They argue that post-ROD materials, including the HPTP and any pre-decisional deliberative documents, are not part of the record and are irrelevant to judicial review of the final agency action approving the Project's interconnection. ECF No. 35 at 11–14. Respondents therefore urge the Court to deny Petitioners' *Motion* in its entirety.

## Relevant Law

Because this *Motion* seeks an order compelling completion of the Administrative Record to include all materials, direct and indirect, considered by WAPA in developing the HPTP, it is appropriate to begin by outlining the relevant legal framework.

Section 106 of the NHPA sets forth specific processes federal agencies must perform to comply with the NHPA. *See* 36 C.F.R. § 800.1(a). First, the agency defines the Area of Potential Effects ("APE"). 36 C.F.R. § 800.4(a). The APE is "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the

character or use of historic properties, if any such properties exist." *Id.* § 800.16(d). After defining the APE, the agency identifies historic properties within the APE. 36 C.F.R. § 800.4(b).

A historic property is "any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on" the National Register of Historic Places (NRHP). 36 C.F.R. § 800.16(l)(1); 54 U.S.C. § 300308. If the agency determines that no historic properties are present within the APE, it reports that finding and the NHPA process ends. 36 C.F.R. § 800.4(d)(1). If historic properties are present within the APE, the agency determines whether the proposed undertaking[3] will adversely affect those properties. *Id.* § 800.4(d)(2); *Id.* § 800.5.

An adverse effect exists "when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the [NRHP] in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1). Adverse effects include "reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id.* They also include the "[i]ntroduction of visual, atmospheric[,] or audible elements that diminish the integrity of the property's significant historic features." *Id.* § 800.5(a)(2)(v).

[3] 36 C.F.R. § 800.16 (y) defines an undertaking to mean, "a project, activity, or program … requiring a Federal permit, license or *approval*." (emphasis added). Clearly based on this definition of undertaking, WAPA had the requisite jurisdiction over approval of this interconnection, to trigger obligations under the NHPA.

If the agency determines that the undertaking may cause an adverse effect on the historic properties within the APE, it must "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id*. § 800.6(a). The Section 106 process does not demand a particular result, "Section 106 is essentially a procedural statute and does not impose a substantive mandate" on the agencies governed by it. *Valley Cmty*., 373 F.3d at 1085.

The NHPA regulations authorize the negotiation of a "[PA] to govern the implementation of a particular program or the resolution of adverse effects from certain complex project situations or multiple undertakings." 36 C.F.R. § 800.14(b). Where this is done, "[c]ompliance with the procedures established by an approved [PA] satisfies the agency's section 106 responsibilities for all individual undertakings of the program covered by the agreement until it expires or is terminated by the agency." *Id.* § 800.14(b)(2)(iii). Thus, the procedures adopted by such an agreement serve as a "substitute" for the regulations that concern consultation for purposes of the agency's compliance with Section 106. *Id.* § 800.14(a)(4).

Because the NHPA does not "provide a private right of action," compliance is reviewed under the test for "final agency action[s] under the" APA. *See Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 839 (10th Cir. 2019); *Utah Env't Cong. v. Russell*, 518 F.3d 817, 823 (10th Cir. 2008). "The Supreme Court has 'interpreted the finality element in a pragmatic way.'" *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1329 (10th Cir. 2007) (quoting *FTC v. Standard Oil of Calif.*, 449 U.S. 232, 239, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980)).

"[A]gency action is final if it satisfies two requirements: 'First, the action must mark the consummation of the agency's decisionmaking [sic] process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (citations omitted); *see also Cure Land, LLC v. United States Dep't of Agric.*, 833 F.3d 1223, 1230–31 (10th Cir. 2016).

Having outlined the statutory and regulatory framework governing the agency's obligations under Section 106 of the NHPA, the Court turns to the legal standards that govern judicial review of those obligations and, specifically, the scope of the administrative record under the APA, as relevant to the present challenge.

Petitioners' *Motion* should only be denied if the Court finds that Petitioners have failed to show by "clear evidence" that the administrative record filed by Respondent WAPA is incomplete. *See Wildearth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243 (D. Colo. 2010) (citing and relying on *Bar MK Ranches*, 994 F.2d at 740). Judicial review of agency action is governed by § 706 of the APA, 5 U.S.C. §§ 701–706. Under § 706(2)(A) of the APA, a district court reviews an agency action to determine if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"A review under this standard is generally based on the full administrative record that was before all [agency] decision makers … at the time of the decision." *Bar MK Ranches*, 994 F.2d at 739 (10th Cir. 1993) (It must be "the full administrative record that

was before all decision makers.") (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971)); *see also* 5 U.S.C. § 706 (courts reviewing agency action under the APA should "review the whole record or those parts of it cited by a party."). The administrative record therefore "consists of all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches,* 994 F.2d at 739 (10th Cir.1993); *Wildearth Guardians,* 713 F. Supp. 2d at 1253 (D. Colo. 2010). The United States Supreme Court has said that "[t]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Local Rule 83.6 also applies similar standards to challenges to federal agency decisions brought under the APA. The rule requires "all documents and materials directly or indirectly considered by the agency and/or agency decision-makers," be disclosed. U.S.D.C.L.R. 83.6(b)(1)(B). Local Rule 83.6 defines the "record in proceedings to review agency action" as: (1) "the final agency action being challenged"; (2) "all documents and materials directly or indirectly considered by the agency and/or agency decision-makers"; and (3) "if existing, the pleadings, evidence, and proceedings before the agency." U.S.D.C.L.R. 83.6(b)(1)(a), (b), & (c).

"[T]he designation of the Administrative Record, like any established administrative procedure, is entitled to a presumption of administrative regularity." *Bar MK Ranches*, 994 F.2d at 740. Absent clear evidence to the contrary, the Court presumes that an agency has "properly designated its record." *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1275 (D. Colo. 2010) (*citing Bar MK Ranches*, 994 F.2d at 739).

Despite the deference given to an agency in defining the administrative record, "[a]n agency may not unilaterally determine what constitutes the [a]dministrative [r]ecord." *Bar MK Ranches*, 994 F.2d at 739 (*citing American Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 539 (1981)). Similarly, the agency "may not skew the record by excluding unfavorable information but must produce the full record that was before the agency at the time the decision was made." *Uintah Cnty., Utah v. Jewell*, No., 2016 WL 4256945, at *3–4 (D. Utah Aug. 11, 2016) (*citing Blue Ocean Institute v. Gutierrez*, 503 F. Supp. 2d 366, 369 (D.D.C. 2007)).

Lastly, regarding Petitioners' contention that Respondent WAPA improperly withheld materials without producing a corresponding privilege log, the obligation to disclose or log withheld materials arises not only from principles of administrative completeness but also from the applicable procedural rules. Local Rule 83.6(b)(2) provides that when filing the administrative record, "the agency shall provide a log describing any document(s) withheld under a claim of privilege. The rule goes on to make clear that the privilege log under this rule must include any "claim that the document(s) reflect the *deliberative process of the agency*." (emphasis added).

## RULING OF THE COURT

### *I. Whether the HPTP Constitutes a Final Agency Action Under the APA*

At the outset, the parties sharply disagree on whether the HPTP prepared by WAPA in September 2024 represents a "final agency action" reviewable under the APA, 5 U.S.C. § 704.

Petitioners argue that their, "Petition for Review initiating this case specifically challenged the [HPTP] prepared and finalized by WAPA in September 2024, alleging that it violates the [NHPA], 54 U.S.C. §§ 300101–307108, in myriad ways." ECF No. 29 at 1; *see also* ECF No. 1 (Petition) ¶¶ 145-156. They state that despite these claims "Respondents have not produced the Final HPTP for judicial review." ECF No. 29 at 1. In fact, they point out that "the administrative record produced by Respondents is devoid of any documents post-dating the July 2022 [ROD]" [*Id.*] Which they contend satisfied "a different statutory obligation under a different law—i.e., [NEPA]." *Id.*

Petitioners contend that the question of whether the agency has properly designated the entirety of the administrative record is "very different from the threshold question of whether there has been final agency action within the meaning of the APA." ECF No. 29 at 10 (cleaned up). They emphasize that this is "a legal question" subject to *de novo* review, and that when the government relies on a purported lack of final agency action to withhold post-ROD documents, "the applicable presumption shifts in Petitioners' favor because the APA 'creates a presumption favoring judicial review of administrative action.'" *Id*. at 10.

Respondent ConnectGen contends that, "[h]ere, the agency action was WAPA's decision to grant the interconnection requests—a decision making process that culminated with the ROD." ECF No. 34 at 4–5. ConnectGen further asserts that the agency "met its NHPA obligations to stop, look, and listen before proceeding with the interconnection request," and that Petitioners' attempt to litigate post-ROD implementation "must be—but is not—based on final agency action." ECF No. 34 at 8. ConnectGen also argues that to fulfill its procedural NHPA obligations, WAPA executed a PA, to which Petitioners are

not parties, and which "vests no rights in Petitioners specifically to enforce its terms."[4] *Id*. at 4.

ConnectGen further argues that any NHPA challenge by Petitioners must be done "…on the basis of the administrative record leading up to the PA and ROD on the interconnection request…" *Id*. at 4-5. ConnectGen emphasizes that, while Petitioners seek to include "post-decisional records", [*Id*. at 5.] such documents are "irrelevant in determining whether federal law was violated when WAPA approved the interconnection." *Id*. Respondents explain that they believe WAPA "correctly closed its administrative record for purposes of the NHPA on the date it published its ROD, which explains how the PA satisfied its NHPA consultation responsibilities, and agreed to permit ConnectGen to connect the wind farm to the nearby, federally owned, electric grid." *Id*. at 4.

ConnectGen's Response also states Section 106 is "essentially a procedural statute and does not impose a substantive mandate on the agencies governed by it." *See* ECF No. 34 at 4. Therefore, a Section 106 consultation "can be satisfied through a four-step process or through a [PA]," [ECF No. 34 at 4] and they argue that when an agency executes a [PA], "it closes the record for purposes of NHPA § 106." *Id*.

[4] This issue will not be addressed further. Neither Petitioner nor Respondent WAPA discuss it, and the record suggests it is not the case. The Petition itself alleges that WAPA "deliberately excluded the involvement of participating parties in the NHPA-required consultation process, including Petitioner ACC, as well as many other consulting parties." ECF No. 1 ¶ 4. The *Motion* notes that "Petitioners participated in the development of the HPTP as consulting parties, submitting extensive comments concerning the scope and magnitude of the Project's adverse effects on historic resources, including the Ames NHL." ECF No. 29 at 8. The Court further observes that ACC is listed multiple times as providing consultation throughout the HPTP. *See* ECF No. 35-3 at 4–5, 7–8. Therefore, ConnectGen's contention that WAPA executed a PA to which Petitioners are not parties, and which "vests no rights in Petitioners specifically to enforce its terms," is incorrect, as Petitioners were recognized and participated as consulting parties under 36 C.F.R. § 800.2.

Similarly, WAPA maintains that it "properly excluded documents related to the HPTP that post-date the ROD because the HPTP is not a final agency action subject to review under the APA." ECF No. 35 at 1. WAPA, like Respondent ConnectGen, contends that the, "… decision-making was complete when WAPA signed the ROD in 2022." *Id*.

WAPA argues that the HPTP will not meet the threshold test for finality as it "is not a final agency action because it is not 'the consummation of the agency's decisionmaking [sic] process' for the federal undertaking at issue here nor any other WAPA action, and it does not determine 'rights or obligations.'" *Id*. at 7-8 (*citing Bennett*, 520 U.S. at 177–78).

In sum, Respondents assert that the ROD constitutes the final agency action for purposes of the APA, that the administrative record leading to the ROD is complete, and that the HPTP and other post-ROD documents do not determine rights or obligations, do not carry legal consequences, and therefore are not subject to judicial review as final agency action.

***A. Finality Analysis***

As already stated, judicial review under the APA is limited to final agency actions. *See* 5 U.S.C. § 704. Under *Bennett*, 520 U.S. at 178, an agency action is final if it satisfies two requirements: (1) it "marks the consummation of the agency's decisionmaking [sic] process" and (2) it is "one by which rights or obligations have been determined, or from which legal consequences will flow." All parties agree that this two-part test governs the determination of finality. *See* ECF No. 29 at 11; ECF No. 34 at 5–7; ECF No. 35 at 6. For purposes of judicial review, the administrative record generally must include all documents and materials "directly or indirectly" considered by the agency in reaching the challenged

action. *See* ECF No. 29 at 13-14; U.S.D.C.L.R. 83.6(b)(1)(B); *Bar MK Ranches*, 994 F.2d at 739–40.

1. Consummation of the Agency's Decision-Making Process

The Court finds that the HPTP constitutes the consummation of WAPA's decision-making process. First, the burden is on Petitioners to properly designate the relevant record to allow meaningful review. Second, issuance of the ROD does not satisfy WAPA's NHPA obligations, as NEPA and NHPA are distinct processes. Third, Petitioners point to a persuasive decision out of the Ninth Circuit that supports treating post-ROD NHPA implementation as final agency action. Fourth and finally, under a pragmatic approach to finality, the HPTP represents the completion of the agency's NHPA obligations, and no further action is required.

***Designation of the Administrative Record***

The Tenth Circuit strictly enforces the requirement that parties designate a complete administrative record as a prerequisite to judicial review. In *Dine Citizen*, the court confronted a "dramatic insufficiency of the [administrative] record," [923 F.3d at 844.] noting that, although appellants challenged more than 300 individual agency actions, they had provided the complete record for only a few. *Id*. The court explained it was "unable to evaluate the sufficiency of the BLM's NHPA and NEPA analyses for the vast majority of the challenged actions," [*Id*.] emphasizing that counsel "must designate a record on appeal ... that is sufficient for considering and deciding the appellate issues," citing 10th Cir. R. 10.4(A), and that "[w]hen the party asserting an issue fails to provide a record or appendix

sufficient for considering that issue, the court may decline to consider it." 10th Cir. R. 10.4(B).

Here, Petitioners have consistently challenged the HPTP since the inception of this lawsuit. *See* ECF No. 1 ¶5 ("WAPA ultimately adopted an HPTP that arbitrarily and unlawfully fails to comply with the agency's obligations under Sections 106 and 110(f) ..."). Petitioners specifically requested that the HPTP "be set aside and remanded for further decision making consistent with federal law." *Id*. at ¶6.

The HPTP is a relevant and challenged agency action, separate from the NEPA-focused ROD. Petitioners' concerns center on WAPA's implementation of the HPTP under the PA, including consultation with the SHPOs, consulting parties, and Indian tribes. *See* ECF No. 1 ¶102-03. The PA provides that WAPA must consider comments from consulting parties, endeavor to reach consensus, and, if consensus cannot be achieved, seek ACHP input under 36 C.F.R. § 800.7 before finalizing the HPTP. ECF No. 35-2 at 4. The PA also required the HPTP to identify each historic property affected and the measures to minimize or mitigate adverse effects. ECF No. 35-2 at 5.

Because Petitioners challenge the HPTP and its compliance with the NHPA, review of post-ROD records is necessary to evaluate the agency's fulfillment of its statutory obligations. Consistent with *Dine Citizens*, the Petitioner's failure to provide a complete record would otherwise be fatal to their request for the Court to review the HPTP and determine whether WAPA's NHPA obligations have been satisfied.

***NEPA ROD and NHPA HPTP***

The analyses required under NEPA and the NHPA are distinct, as each statute imposes separate procedural obligations and culminates in different agency determinations. Petitioners contend that "the Final HPTP purports to make good on repeated promises in the 2021 PA and 2022 ROD to someday identify and resolve the Project's adverse effects on historic properties, including by adopting measures to minimize and mitigate effects." ECF No. 29 at 12. They argue that "… the HPTP (i.e., the satisfaction of WAPA's NHPA obligations) also postdates the ROD, meaning logically, the ROD could not have marked the consummation of the agency's NHPA process under the PA because that process was incomplete when the ROD was issued." ECF No. 29 at 12-13 (cleaned up).

Respondents, by contrast, conflate NEPA and the NHPA, arguing that the Section 106 process was completed with the ROD and that the HPTP merely implements contractual obligations without creating new agency action. *See* ECF No. 35 at 8–9; ECF No. 34 at 4 ("The federal government correctly closed its administrative record for purposes of the NHPA on the date it published its ROD…"). WAPA argues that "[t]he HPTP implements the terms of the PA, but it does not inform any yet-to-be-decided federal undertaking. And the PA did not task WAPA with enforcing the terms of the HPTP, much less approving construction of ConnectGen's project." ECF No. 35 at 12. As the Court understands the argument, Respondents view is that the ROD marked the consummation of federal decision-making for the undertaking, and the HPTP is simply a mechanism to advise the project proponent on measures to minimize adverse effects. *See* ECF No. 35 at 1, 8–9.

The Court is not persuaded that the same action that consummates the NEPA process also consummates the NHPA process. NEPA and the NHPA are entirely separate statutes, each with distinct statutory structures, procedures, and obligations. *See* NEPA, 42 U.S.C. §§ 4321 et seq.; 40 C.F.R. §§ 1500–1508; *see also* NHPA, 54 U.S.C. § 306108; 36 C.F.R. § 800 (establishing separate statutory obligations and procedural requirements).

First, RODs are issued to satisfy NEPA requirements. *See* 40 C.F.R. §§ 1505.2; *see also Cure Land, LLC,* 833 F.3d at 1230 ("To comply with NEPA, a federal agency undertaking a major action significantly affecting the quality of the human environment must prepare a thoroughgoing environmental impact statement assessing the predicted impacts of the proposed action on all aspects of the environment. If the agency decides to continue with a major federal action despite significant environmental impacts, it must explain its reasons in a record of decision. 40 C.F.R. § 1505.2.") (citations omitted); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt*., 565 F.3d 683, 703–04 (10th Cir. 2009) (citing 40 C.F.R. § 1505.2 for the proposition that NEPA requires publication of a record of decision after a decision is made).

Numerous cases in the Tenth Circuit recognize NEPA and NHPA analyses as separate and distinct. *See Dine Citizens*, 923 F.3d at 839 (treating NEPA and NHPA analyses as separate and distinct); *Coal. of Concerned Citizens to Make Art Smart v. Fed. Transit Admin. of U.S. Dep't of Transportation*, 843 F.3d 886, 901–02 (10th Cir. 2016) (same); *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1262 (10th Cir. 2001) (discussing the analysis as similar but distinct).

In fact, a court in this circuit has directly addressed whether a final agency action under NEPA also constitutes a final agency action under the NHPA. *See Taxpayers Opposed to Oz, Inc. v. Barram*, 2000 WL 1595754, at *3–4 (D. Kan. Oct. 16, 2000) ("Plaintiff asserts that final agency action under the NEPA constitutes final agency action under the NHPA. The court recognizes the similarity in considerations under both regulatory review schemes, as both processes involve the review of historic properties."). The court concluded, however, that despite some overlap between the statutes, "NEPA requires consideration of the environment, whereas the NHPA requires a more involved consideration of historic sites" [*Id*. at *3] and "the NHPA has its own detailed regulatory scheme that must be followed," [*Id*.] and therefore, final agency action under one statute does not culminate the statutory obligations of the other. *Id*. ("In contrast, plaintiff asserts that defendant's action in issuing an EA, and a resulting FONSI under the NEPA regulatory scheme constitutes final agency action under both the NEPA and the NHPA sufficient to satisfy the APA final agency action requirement. The court disagrees.").

For these reasons, the ROD cannot be considered final agency action under the NHPA. The issuance of a ROD satisfies NEPA obligations but does not address or resolve the ongoing NHPA responsibilities. Accordingly, the ROD does not constitute final agency action under the NHPA.

***Tohono***

Petitioners rely on *Tohono* which recognized that agency action can be sufficiently final, and therefore reviewable, under the NHPA even when it occurs after a NEPA-based ROD has been issued.

The Ninth Circuit recently considered the finality analysis in relation to the NHPA when a Tribe's consultation claims were brought before it in *Tohono O'odham Nation*.[5] There, a private company filed an application with BLM in 2008 for permission to build a 515-mile transmission line through New Mexico and Arizona. *Tohono O'odham Nation*, 138 F.4th at 1194-95. "A portion of the Route runs through the San Pedro Valley, northeast of Tucson. The Valley is of great historic and cultural importance to several Native American Tribes, including the Tohono O'odham Nation, the San Carlos Apache Tribe, the Hopi Tribe, and the Zuni Pueblo." *Id*. at 1195.

BLM conducted an environmental review of the proposal under NEPA; issued a Final Environmental Impact Statement in June 2013; issued a PA in December 2014 that addressed its consultation obligations under NHPA; and issued a ROD in January 2015 that granted the right-of-way application. *Id*. However, the ROD clarified that the company could not actually begin construction until it received a subsequent LNTP and specified that an LNTP *could not be issued* until the BLM's consultation obligations set forth in the PA were fulfilled. *Id*. ("Instead, the ROD provides that SunZia "shall not commence

---

[5] The Respondent ConnectGen argues that the procedural posture of *Tohono*, decided on a motion to dismiss, makes the case inapplicable here, where the Court is considering a motion to complete the administrative record. *See* ECF No. 34 at 6-7 ("Finally, the Court should also consider that the Ninth Circuit decided *Tohono* in the context of a motion to dismiss, where the court must accept as true all well-plead allegations of material fact and construe them in the light most favorable to the non-moving party.").While the motion to dismiss posture affected how the court treated the alleged facts, it did not alter the legal analysis of final agency action under Section 106 of the NHPA. The Ninth Circuit in *Tohono* conducted a full two-step analysis of finality for agency actions issued to satisfy Section 106 obligations following a NEPA ROD. *Tohono O'odham,* 138 F.4th at 1200. Here, on a motion to complete the administrative record, the Court is not required to accept any allegations as true; rather, it examines whether the administrative record is complete based on the challenged agency action(s). Specifically, the Court must determine whether the HPTP constitutes final agency action based on the actual materials considered by the agency. Accordingly, the procedural posture does not diminish the relevance of *Tohono's* reasoning.

construction or proceed with ground-disturbing activities until [it] ... receives and accepts the right-of-way grant, and also receives a written Notice to Proceed.”).

Years later, in September and November 2023, BLM issued two LNTPs to the company, which prompted the company to begin construction activities. *Id*. at 1197-98. In response, various tribal and environmental organizations filed a lawsuit and sought a preliminary injunction, claiming among other things “that the Department violated the NHPA by authorizing Project construction to begin in the San Pedro Valley before completing its NHPA obligations.” *Id*. at 1199.

The district court denied the request for injunctive relief and dismissed the lawsuit, but the Ninth Circuit reversed the dismissal order. *Id*. at 1198. The court identified one of the “key issue[s]” as “whether the LNTPs constitute final agency actions.” *Id*. at 1200. As for the first element of *Bennett’s* finality test, the court concluded that “the LNTPs mark the consummation of the agency's decisionmaking [sic] process about whether there are historic properties present in the San Pedro Valley” and “also represent the agency's final determination that construction will not restrict subsequent mitigation measures to protect historic properties, as such a determination was a prerequisite to authorizing construction under the PA.” *Id*. at 1201 (cleaned up).

As for the second element of *Bennett’s* finality test, the court concluded that “[t]he LNTPs also determine ‘rights’” because, “[m]ost importantly, they expressly grant SunZia the right to begin construction in the San Pedro Valley.” *Id*. Finally, the court rejected the defendants’ argument “that the ROD is the only final agency action relevant here,” explaining that “the ROD could not have marked the consummation of the Department's

NHPA process under the PA; that process was incomplete when the ROD was issued." *Id*. Ultimately, the Ninth Circuit held, "…that the LNTPs constitute final agency actions because they represent the Department's final decision that the PA requirements had been satisfied, and that [the company] could therefore begin construction in the San Pedro Valley." *Id*. at 1201-02.

Petitioners argue that the same logic applies here: WAPA's HPTP, which identifies avoidance, minimization, and mitigation measures for historic properties and satisfies WAPA's NHPA obligations, was issued after the ROD and represents the final agency action under the PA and in the NHPA process. ECF No. 29 at 12. Petitioners argue that like *Tohono*, it is the HPTP in this case, not the ROD, that consummates WAPA's NHPA process. *Id*. ("Here too, the HPTP (i.e., the satisfaction of WAPA's NHPA obligations) also postdates the ROD, meaning '[l]ogically, the ROD could not have marked the consummation of the [agency]'s NHPA process under the PA' because 'that process was incomplete when the ROD was issued.'")

ConnectGen contends that Petitioners' reliance on *Tohono* is misplaced because Petitioners' *Motion* assumes they may separately challenge WAPA's HPTP. ECF No. 34 at 5-6. ConnectGen also argues that Petitioners reliance on *Tohono* is unhelpful because the facts there are materially distinguishable from the facts here.

ConnectGen explains,

> In *Tohono*, after the [PA] was executed in 2014 and the ROD was issued in 2015, the federal government had continuing authority—and was required—to take additional action to authorize construction of the project. *Id*. at 1195. Although the plaintiffs took issue with the HPTP, that plan was not the "final

> agency action" that made the plaintiffs' NHPA claims reviewable under the APA. *Id*. Instead, the Ninth Circuit concluded that the limited notice to proceed to construction "represent[ed] the Department's final decision that the [programmatic agreement] requirements had been satisfied," and that the project proponent "could therefore begin construction." *Id*. at 1201–02. In the context of that final agency action, the Ninth Circuit found that the complaint had stated a plausible violation under the programmatic agreement.

[ECF No. 34 at 6] ConnectGen argues that here, no comparable WAPA action exists following the ROD. ECF No. 34 at 6 ("Here, Petitioners have not identified a separate WAPA-action after the ROD, such as a notice to proceed"). Unlike in *Tohono*, WAPA says they do "not possess the regulatory authority to approve or deny the siting, design, construction, or operation of" the wind farm, and the ROD therefore marked the conclusion of the agency's "yes or no decision" on the interconnection. ECF No. 34 at 6. ConnectGen further notes that *Tohono* was decided on a motion to dismiss and was not a record dispute, it therefore argues that the case does not support treating the HPTP as a final agency action in the motion to compel context. ECF No. 34 at 6-7. [6]

WAPA further explains, "the LNTPs were clearly federal action. In *Tohono*, the BLM authorized project construction by granting the project proponent's request for the LNTP. And, because the PA there tasked the BLM with first determining that construction would not restrict subsequent mitigation measures to protect historic properties, before

[6] *See* supra note 5 (noting that *Tohono's* motion to dismiss posture does not limit its usefulness in resolving the issue before the Court).

issuing that authorization, the LNTP represented the consummation of BLM's decision-making process on the project proponent's request." ECF No. 35 at 9-10 (cleaned up).

WAPA emphasizes that, unlike in *Tohono* where the BLM, had regulatory authority over land use, it "does not possess the regulatory authority to approve or deny the siting, design, construction, or operation of the Project." ECF No. 35 at 4. WAPA stresses that it has no interest or role in ConnectGen's proposed wind energy Project, nor will it have any continuing involvement in construction or operation other than at its switchyard. *Id*. It argues the proposed Project is a private sector development, and that it, "did not have any pending federal undertaking or other agency decision [before it] when the HPTP was finalized; thus, it could not have been the 'consummation' of any WAPA decisionmaking [sic] process subject to the NHPA." ECF No. 35 at 10.

WAPA further notes that, unlike the LNTPs in *Tohono*, which "expressly grant[ed] [the project applicant] the right to begin construction…the HPTP did not conclude any" such action on WAPA's behalf. ECF No. 35 at 12 ("The HPTP fails the first *Bennett* factor because it is not the consummation of WAPA's decision-making process for the federal undertaking here: WAPA's decision to approve the interconnection request. WAPA made that decision in the 2022 ROD, and nothing about the HPTP suggests that WAPA was reconsidering that decision.").

WAPA explains that the HPTP, which was still under development at the time of the ROD, would only "analyze potential adverse effects to listed or eligible cultural resources and may identify those measures to reduce those effects." ECF No. 35 at 5. WAPA emphasizes that "the ROD did not incorporate the terms and conditions of the PA

or the HPTP." ECF No. 35 at 5. And, although WAPA concedes that "[a]ll requirements of the PA [had to] . . . be concluded before any construction activities [could] commence," [ECF No. 35 at 5], it still seeks refuge in the idea that because it had no continuing authority over the Project, the HPTP could not represent the consummation of the NHPA process. Therefore, no relevant final agency action exists for this Court to review. ECF No. 35 at 5 ("neither the ROD nor the PA assigned WAPA the authority or responsibility to enforce mitigation measures or otherwise authorize construction. Indeed, as explained above, both made clear that WAPA lacked such authority."); *but see* ECF 35-1 at 13 ("WAPA 's HPTP is currently under development, and the requirements of the HPTP and PA must be completed prior to any Project ground-disturbing activities that could affect listed or eligible cultural resources.").

This Court disagrees that *Tohono* is not helpful. Respondents suggest that cases like *Snoqualmie* foreclose the outcome here or somehow contradict *Tohono*, but that is incorrect. ECF No. 34 at 6-7 ("…and the Ninth Circuit panel apparently saw no tension in its ruling and the ruling of an earlier Ninth Circuit panel that execution of a programmatic agreement closes the record for the purposes of NHPA Section 106. *Snoqualmie Indian Tribe*, 545 F.3d at 1211."). *Snoqualmie* did not address the question of post-ROD review and therefore offers limited guidance on that issue. *Snoqualmie Indian Tribe v. FERC*, 545 F.3d 1207, 1215–16 (9th Cir. 2008).

By contrast, *Tohono* directly addresses post-ROD agency actions and is therefore highly persuasive. The Tenth Circuit has held under different circumstances that it is not an abuse of discretion to consider post-ROD materials, even when the ROD itself is the

basis of the challenge. *See Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1085–86 (10th Cir. 2004) (finding it was not an abuse of discretion for the court to consider post-ROD materials under Section 4(f) of the Department of Transportation Act—which, like Section 106 of the NHPA, requires consultation and evaluation of effects on historic and cultural resources—and holding that "certain materials may be considered if they come into existence after the agency's decision and demonstrate that the actions were right or wrong."*) (citing Reno-Sparks Indian Colony v. Haaland*, 663 F. Supp. 3d 1188, 1196 (D. Nev. 2023), appeal dismissed, No. 23-15780, 2024 WL 2317688 (9th Cir. Jan. 4, 2024)) (reviewing tribe's NHPA consultation claim and considering post-ROD documents, including materials related to the [HPTP], in concluding that BLM's consultation efforts were reasonable; noting that agency correspondence and tribal response after the ROD further demonstrated the adequacy of consultation).

While *Tohono* was distinguishable because it involved an LNTP that expressly authorized construction once the NHPA obligations were satisfied, the logic of the decision is instructive here.

WAPA's ROD approved the federal undertaking under NEPA, but the NHPA compliance was ongoing and conditional. *See* ECF No. 35-2 ([PA] stating that pursuant to the NHPA "WAPA, as the lead federal agency" will "resolve adverse effects on historic properties through the development and implementation of one or more HPTP… [which] *will* provide specific avoidance, minimization, or mitigation measures…") (emphasis added).

In fact, the PA states that its purpose is to account for the possibility that "…identification efforts and effects on historic properties may not be fully determined prior to approval of the undertaking (36 CFR § 800. l4(b)(l)(ii))." ECF No. 35-3 at 3. Because the effects on historic properties were not fully determinable at the time of execution of either the ROD or PA, the PA stated that "WAPA, through the Applicant, [would] resolve adverse effects on historic properties through the development and implementation of one or more HPTP… [which would] provide specific avoidance, minimization, or mitigation measures, commensurate with the adverse effects, including cumulative effects, that may be caused by the undertaking." ECF No. 35-2 at 9. As in *Tohono*, the parties clearly recognized that the NHPA obligations would be carried out long after the ROD was issued. It is therefore incongruous to suggest that the Petitioners are somehow barred from accessing the documents underlying the HPTP, the very plan through which these statutorily mandated determinations were being carried out.

Under 36 C.F.R. § 800.2(a)(3), the agency official "remains legally responsible for all required findings and determinations," meaning that while consultants may assist, the agency itself must make and justify the determinations required by Section 106. Denying Petitioners access to the records informing the HPTP would frustrate the Court's ability to review whether WAPA fulfilled its Section 106 obligations and whether the PA's intended protections for historic properties were properly implemented. To assess whether WAPA complied with both the statute and the PA, the full administrative record relied upon for the Section 106 analysis must be available for review.

WAPA's contention that "[t]he HPTP is … not an agency action" [ECF No. 35 at 1] and that "decision-making was complete when WAPA signed the ROD in 2022" [*Id.*] is contradicted by the record. The ROD, which WAPA issued, explicitly recognized that completion of the PA process, including steps such as the creation and implementation of the HPTP, would "resolve the adverse effects from the undertaking and meet WAPA's NHPA Section 106 responsibilities." ECF No. 35-1 at 14. Accordingly, it cannot reasonably be argued that the undertaking concluded with the issuance of the ROD, or that subsequent decisions, specifically contemplated by the ROD as necessary to fulfill statutory obligations, are beyond review.

Additionally, while WAPA emphasizes that it is "unlike" the BLM in *Tohono* and suggests that its involvement and authority are minimal, the Court finds this mischaracterizes WAPA's role in the NHPA process in this Project. ECF No. 35 at 14. The PA explicitly outlines WAPA's central involvement in the HPTP, the action challenged here, establishing that WAPA is, in fact, the primary agency responsible for overseeing and implementing this process. *See* ECF No. 35-2.

Although it may be true that, under the PA, WAPA lacks "authority over Applicant's proposed Project, including electrical generation methods, selection and siting of equipment, and construction and operation of the proposed Project" [ECF No. 35-2 at ¶4], WAPA does not lack the authority to approve or deny the connection request, the federal undertaking at issue here. Whether or not WAPA had made a "yes or no" decision on the interconnection prior to carrying out its obligations under the PA does not diminish its statutory authority or responsibility to fulfill its duties under Section 106.

WAPA is the agency statutorily required to carry out this task. *See* 36 C.F.R. § 800.2 (recognizing that "it is the statutory obligation of the Federal agency to fulfill the requirements of section 106" and that the agency official "remains legally responsible for all required findings and determinations."). WAPA cannot shield its Section 106 compliance from review by suggesting that its authority ended with the issuance of the ROD. The record does not support such a position.

The PA consistently frames HPTP obligations in future-tense language, demonstrating that WAPA anticipated these obligations would be satisfied during HPTP implementation.[7] Sections IV and VI of the PA make clear that HPTP measures, including avoidance, minimization, and mitigation of impacts to historic properties, are prerequisites for construction in certain locations and circumstances. *See* ECF No. 35 at 5; ECF No. 35-2 §§ IV.C.3.b.vi, IV.C.3.b.ix (mitigation measures in the PA mandating that certain "treatment measures… be completed prior to construction.") In fact, the ROD in this matter plainly states that, "WAPA 's HPTP is currently under development, and the requirements

[7] The PA itself confirms that WAPA retained active, ongoing obligations under Section 106 following issuance of the ROD. For example, it provides that: "If WAPA determines that the undertaking will have adverse effects on historic properties, WAPA shall consult with SHPOs, consulting parties and Indian tribes to develop and evaluate adjustments or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects to those properties." ECF No. 35-2 at § IV.A. It further directs that "WAPA with the Applicant will develop a HPTP outline," [*Id*. at § IV.C.2] and that "[o]nce an HPTP is completed and accepted by WAPA, the WAPA will provide the HPTP to the consulting parties." *Id*. § IV.C.2.b. After receiving comments, "WAPA will take all comments into account and request of the Applicant to revise the HPTP, as appropriate," [*Id*. § IV.C.2.c] after which "WAPA will submit the final HPTP to the consulting parties and the appropriate SHPO for a 30-calendar-day review and concurrence." *Id*. Finally, "WAPA will endeavor to reach consensus on the HPTP, but if the consulting parties fail to resolve adverse effects in a reasonable timeframe, WAPA will comply with 36 C.F.R. § 800.7 and seek ACHP comment and move forward accordingly." *Id*. These provisions confirm that WAPA's statutory and contractual obligations under Section 106 continued well after the ROD and into the development and approval of the HPTP, and their involvement certainly cannot be characterized as minor based on the foregoing.

of the HPTP and PA must be completed prior to any Project ground-disturbing activities that could affect listed or eligible cultural resources." ECF No. 35-1 at 13. [8]

Accordingly, as in *Tohono*, the Section 106 process is not fully consummated at the time of the ROD. Rather, WAPA's NHPA obligations culminate when the obligations are met. The parties anticipated in the PA that the HPTP would fulfill the Section 106 and PA obligations.[9] While WAPA may lack authority over construction of the Project itself, such a lack of authority does not affect the Court analysis. *See Tohono,* 138 F.4th at 1195 (9th Cir. 2025) (noting that BLM's role in *Tohono* was limited to granting a right-of-way over federal land and did not involve actual construction of the project). Whether regulating land use or electrical grid use, the question here is whether the agency action that is being challenged is the final point of the analysis in the NHPA process.

In both *Tohono* and the case at bar, the commencement of construction was contingent on completion of WAPA's Section 106 obligations. Here, the HPTP functions analogously to the LNTP in *Tohono* by imposing preconditions for proceeding with ground-disturbing activities. Accordingly, the post-ROD development, approval, and implementation of the HPTP are highly relevant to determining whether WAPA and ConnectGen have fulfilled their continuing obligations under the NHPA. They are also

[8] *See* supra note 3 (quoting the regulatory definition of "undertaking" and explaining its application to WAPA's NHPA obligations).

[9] The procedures adopted by a PA serve as a "substitute" for the regulations that concern consultation for purposes of the agency's compliance with Section 106. 36 C.F.R. § 800.14(a)(4). It is not until compliance with the PA that the Section 106 obligations are fulfilled. *See Id*. § 800.14(a)(4) (describing the effect of adopting a PA as a "substitute for the Council's regulations for the purposes of the agency's compliance with Section 106"); *see also Colo. River Indian Tribes v. Dep't of Interior*, 2015 WL 12661945, at *13 (C.D. Cal. June 11, 2015) (explaining that obligations under a PA serve as a substitute to compliance with Section 106).

relevant to evaluating Petitioners' contention that the "HPTP … arbitrarily and unlawfully fails to comply with the agency's obligations under Sections 106 and 110(f) to avoid and minimize the Project's harm…" ECF No. 1 ¶ 5.

*Tohono* is directly on point in assessing whether final agency action under the NHPA can occur after issuance of a NEPA ROD. In both *Tohono* and this case, the Section 106 process was not fully consummated at the time of the ROD; rather, agency obligations continued and were conditioned on subsequent actions, LNTPs in *Tohono* and the HPTP here. WAPA's HPTP, like the LNTPs, were the prerequisite for ground-disturbing activities, making them central to determining whether the agencies met their NHPA obligations.

Although WAPA lacks authority over construction itself, this is analogous to BLM's limited role in *Tohono*: neither agency physically built the project, but both retained responsibility for ensuring compliance with Section 106. The HPTP, therefore, represents the culmination of WAPA's Section 106 responsibilities under the PA and the NHPA. Post-ROD development, approval, and implementation of the HPTP are not only relevant but essential to evaluating whether WAPA and ConnectGen fulfilled their statutory and regulatory obligations, and to assessing Petitioners' claims that the HPTP "arbitrarily and unlawfully fails to comply with the agency's obligations under Sections 106 and 110(f) to avoid and minimize the Project's harm." ECF No. 1 ¶ 5.

***The Finality Inquiry Is a Pragmatic One***

Finally, when considering whether the HPTP marks the consummation of WAPA's decision making process under Section 106 of the NHPA, the Court is guided by a

pragmatic approach. The Supreme Court has made clear that the finality inquiry is "flexible" and "pragmatic," rather than rigid or formalistic. *See Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 728 F. Supp. 3d 1227, 1235 (D. Wyo. 2024) ("Courts take a 'pragmatic' approach to finality (*citing U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 591, 136 S. Ct. 1807, 1810, 195 L. Ed. 2d 77 (2016)); *Grand Canyon Tr. v. Pub. Serv. Co. of New Mexico*, 283 F. Supp. 2d 1249, 1252 (D.N.M. 2003) ("Determination of the finality of agency action for purposes of judicial review is to be made in a pragmatic way) (*citing Pennzoil Co. v. Federal Energy Regulatory Comm'n,* 645 F.2d 394, 399 (5th Cir.1981)); *CSG Expl. Co. v. FERC*, 930 F.2d 1477, 1483 (10th Cir. 1991) ("The inquiry is a 'flexible' one that necessarily takes into account "pragmatic considerations.") (*citing FTC v. Standard Oil of California,* 449 U.S. 232, 240, 101 S.Ct. 488, 493, 66 L.Ed.2d 416 (1980)).

Under this pragmatic lens, the question is not whether the agency used particular procedural formalities, but whether its process has effectively reached an endpoint. Petitioners correctly emphasize that this threshold inquiry is distinct from a record-completeness dispute. They contend that "the question of whether the agency has properly designated the entirety of the administrative record is very different from the threshold question of whether there has been final agency action within the meaning of the APA." ECF No. 29 at 10 (cleaned up).

The latter, they note, is a question of law subject to de novo review, and when the government relies on a purported lack of final agency action to withhold post-ROD documents, the applicable presumption shifts in Petitioners' favor because the APA creates

a presumption favoring judicial review of administrative action. *See generally Id*. at 11. While the "petitioner has the burden of identifying specific federal conduct and explaining how it is final agency action within the meaning of section 551(13)," [*Colorado Farm Bureau Fed'n v. U.S. Forest Serv.*, 220 F.3d 1171, 1173 (10th Cir. 2000)], once they have done so, the presumption shifts in favor of the Petitioner's position. *Sackett v. EPA*, 566 U.S. at 128 (APA "creates a presumption favoring judicial review of administrative action"); *see also High Country Citizens All. v. Clarke*, 454 F.3d 1177, 1181-82 (10th Cir. 2006) ("A presumption of reviewability accompanies agency actions under the APA, but it may be overcome." (citation omitted)).

When viewing this record through that pragmatic lens and in light of the presumption, the Court agrees that the HPTP represents the culmination of WAPA's Section 106 decision-making. As discussed above, the HPTP was developed and issued specifically to fulfill WAPA's continuing obligations under the 2021 PA and 2022 ROD. In doing so, WAPA finalized the manner in which it would address and mitigate adverse effects to historic properties, precisely the work that Section 106 requires.

Additionally, as Petitioners' point out, "there is nothing in the record or elsewhere indicating that further consultation under the NHPA is expected, let alone required by law." ECF No. 29 at 11-12, *see also Sackett*, 566 U.S. at 127 ("The mere possibility that an agency might reconsider in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal."). Moreover, Respondents do not point to any further action that would be required after the issuance of the HPTP. It is clear from the ROD that the parties anticipated that further

action was required in this matter for NHPA compliance. *See* ECF No 35-1 at 13 (WAPA's ROD stating "WAPA 's HPTP is currently under development, and the requirements of the HPTP and PA must be completed prior to any Project ground-disturbing activities that could affect listed or eligible cultural resources.").

Pragmatically, then, the HPTP is not a tentative or preliminary step, but the endpoint of WAPA's consultative process under the NHPA. It thus marks the consummation of WAPA's decision making for purposes of determining final agency action. *Bennett v. Spear*, 520 U.S. 154 (1997) ("First, the action must mark the consummation of the agency's decisionmaking [sic] process—it must not be of a merely tentative or interlocutory nature.").

2. Rights or Obligations Determined

Having found that the HPTP marks the consummation of the agency's decision-making process under the first *Bennett* prong, the remaining question is whether the HPTP is one "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78.

Here, the record demonstrates that the HPTP is more than "purely advisory" *Id*. at 178. The ROD for this Project confirms that the HPTP imposes binding, enforceable obligations governing how and when construction activities may proceed, including specific mitigation, monitoring, and funding commitments under the PA. ECF No. 35-2. The ROD states, "WAPA's HPTP is currently under development, and the requirements of the HPTP and PA must be completed prior to any Project ground-disturbing activities that could affect listed or eligible cultural resources." ECF No. 35-1 at 13. The HPTP is neither

discretionary nor advisory, it defines the conditions under which the Project may move forward, and WAPA expressly retains authority to review and ensure compliance. *See* 36 C.F.R. § 800.2(a) (assigning to the agency official the "statutory obligation" to fulfill Section 106 responsibilities); *see also* ECF No. 35-2 at 14.

By WAPA's own account, no construction may begin until the HPTP's terms have been approved and implemented. The HPTP therefore carries "direct consequences" and represents far more than "a tentative recommendation." *Bennett*, 520 U.S. at 178. It embodies "a final and binding determination" of the agency's compliance with its remaining NHPA obligations. *Id*.

Again, the Ninth Circuit's reasoning in *Tohono* is instructive. As explained earlier in this Order, the court there held that LNTPs constituted final agency actions because they represented the BLM's final determination that the requirements of a PA had been satisfied and, critically, because they conferred on the project proponent the right to begin construction. As the court explained:

> The LNTPs also determine 'rights.' *Oregon Nat. Desert Ass'n*, 465 F.3d at 982. Most importantly, they expressly grant SunZia the right to begin construction in the San Pedro Valley. Defendants' counterarguments are unpersuasive. They argue that the ROD is the only final agency action relevant here and that the LNTPs merely implement the ROD. But the ROD did not decide whether the PA requirements had been satisfied. Indeed, the ROD stated that 'the identification and evaluation process provided in the PA will be completed after the ROD and right-of-way permit are issued, but prior to Project construction.' (emphasis added). Logically, the ROD could not have marked the consummation of the Department's NHPA process under the PA; that process was incomplete when the ROD was issued.

*Id*. at 1201. The same is true here. WAPA's own ROD expressly stated that the identification and evaluation process "…is currently under development, and the requirements of the HPTP and PA must be completed prior to any Project ground-disturbing activities that could affect listed or eligible cultural resources." ECF No. 35 at 13. As in *Tohono*, WAPA's ROD did not decide whether its PA obligations under Section 106 had been fulfilled; rather, it deferred that determination to the forthcoming HPTP. Thus, the HPTP, like the LNTPs in *Tohono*, marks the agency's final decision that its PA obligations have been met and that construction may begin. It fixes both the rights to proceed and the obligations to comply.

The Ninth Circuit in rejecting the argument that the ROD was the only final agency action, emphasized that plaintiffs were not challenging the route determination itself but rather the agency's failure to fulfill its continuing NHPA duties:

> Defendants also argue that the ROD is the final agency action because it established the Route, which is what Plaintiffs really challenge. But this argument mischaracterizes Plaintiffs' claim. As discussed above, Plaintiffs have clarified that they do not challenge the Route as established under the ROD. Rather, they 'request that the Court ensure BLM fulfills [its] NHPA obligations' under the PA.

*Tohono O'odham*, 138 F.4th at 1201. The same is true here. Petitioners do not challenge WAPA's grant of the interconnection under the ROD. Rather, they seek judicial review to ensure that WAPA fulfilled its independent obligations under the PA and Section 106 of the NHPA. As in *Tohono*, those obligations persisted after the ROD and culminated in the agency's approval of the HPTP.

Finally, *Tohono* concluded that "the ROD therefore could not have determined that the Route was fixed and final for NHPA purposes," [*Id*]. and that "[t]he LNTPs constitute final agency actions because they represent the Department's final decision that the PA requirements had been satisfied, and that SunZia could therefore begin construction." *Id.* at 1201-02. The same reasoning applies here: the HPTP represents WAPA's final determination that the PA's requirements have been met, and that the Project may therefore proceed to ground-disturbing activities. It is, in short, the final and binding decision carrying "direct consequences" under *Bennett*, 520 U.S. at 178.

***B. Completeness of Administrative Record***

Under the APA, judicial review is generally based on the full administrative record that was before the agency at the time of its decision. *See* 5 U.S.C. § 706; *Bar MK Ranches,* 994 F.2d at 739–40. This "whole record" includes all documents and materials directly or indirectly considered by the agency. *See* 5 U.S.C. § 706 (courts reviewing agency action under the APA should "review the whole record or those parts of it cited by a party."); *WildEarth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1253 (D. Colo. 2010); *see also*, U.S.D.C.L.R. 83.6(b)(1)(B) (mirroring the federal standard, defining the administrative record to include: "The final agency action being challenged and all documents and materials directly or indirectly considered by the agency or its decision-makers.).

The purpose of this rule is to ensure that the Court can properly evaluate the agency's rationale at the time of the decision. *Bar MK Ranches*, 994 F.2d at 739 ("[R]eview under this standard is generally based on the full administrative record that was before all

decision makers . . . at the time of the decision."). In designating the record, an agency enjoys a presumption of administrative regularity, which assumes that the record has been properly compiled. *Id*. at 740. An agency may not however unilaterally determine what constitutes the record or exclude unfavorable information. *Id*. at 739; *Uintah Cnty., Utah v. Jewell*, 2016 WL 4256945, at *4 (D. Utah Aug. 11, 2016). The presumption of regularity can be rebutted by "clear evidence" that relevant documents were omitted. *WildEarth Guardians*, 713 F. Supp. 2d at 1253.

Here such evidence is clear. WAPA categorically excluded documents related to the HPTP that post-date the ROD, asserting that the HPTP is not a final agency action. *See* ECF No. 35 at 1 ("…WAPA properly excluded documents related to the HPTP that post-date the ROD because the HPTP is not a final agency action subject to review under the APA."); ECF No. 34 at 4 ("The federal government correctly closed its administrative record for purposes of the NHPA on the date it published its ROD…."); ECF No. 36 at 3 ("there is no dispute about what is not in the administrative record lodged by WAPA in this case; it does not include any materials post-dating WAPA's July 2022 ROD for this Project, meaning that neither the final HPTP specifically challenged by Petitioners nor any documents or materials considered directly or indirectly by WAPA are included in the Record.) (cleaned up).

The administrative record lodged by WAPA does not include the HPTP itself or any materials considered, directly or indirectly, in its development. Because the Court has determined that the HPTP satisfies the two-part test for finality and constitutes a final agency action, this omission renders the record incomplete. Without these documents, the

Court cannot meaningfully evaluate Petitioners claim that the HPTP was developed in an "arbitrary and capricious manner." ECF No. 1 ¶ 5.

Accordingly, the Court **ORDERS** Respondents to complete the administrative record to include all documents and materials directly or indirectly considered by WAPA in developing the HPTP.

***C. Privilege Log Issue***

Lastly, Petitioners contend that WAPA's failure to produce a privilege log violates the plain language of this Court's Local Rule 83.6(b)(2), which governs judicial review of federal agency actions in the District of Wyoming. Petitioners' *Motion* seeks "an order directing Respondents … to produce documents necessary to enable judicial review of the final agency actions challenged in the Petition for Review of Agency Action … and a privilege log listing all documents considered but withheld by Respondents in making those decisions." ECF No. 29 at 1.

Petitioners argue that Respondents have withheld "plainly pertinent documents" [ECF No. 29 at 14] from the administrative record and "fail[ed] to produce a privilege log … despite admitting to withholding documents from the administrative record, including some that predate the ROD." *Id*. This omission, Petitioners contend, directly violates the governing Local Rule 83.6(b)(1) which provides that when filing the administrative record, "the agency shall provide a log describing any document(s) withheld under a claim of privilege, including a claim that the document(s) reflect the deliberative process of the agency." They note that the same rule defines the administrative record broadly to include

"all documents and materials directly or indirectly considered by the agency and/or agency decision-makers." U.S.D.C.L.R. 83.6(b)(1); ECF No. 29 at 14–15.

Petitioners contend that WAPA's position, that no log is required for deliberative materials, conflicts with the Local Rule's plain language. Petitioners stress that Local Rule 83.6 provides an independent basis for requiring a privilege log, regardless of how other courts, such as the D.C. Circuit in *Oceana v. Ross*, 920 F.3d 855 (D.C. Cir. 2019), have approached deliberative materials. The rule's language "expressly requires a log for any withheld document, including those withheld under the deliberative process privilege," [U.S.D.C.L.R. 83.6(b)(1)]and thus Petitioner's argue the Court need not reach out-of-circuit disputes over whether deliberative materials belong in the record. *See* ECF No. 29 at 10.

Respondents counter that a privilege log is unnecessary because WAPA did not withhold any documents based on a claim of privilege. ECF No. 35 at 16. WAPA explains that it properly excluded pre-decisional and deliberative materials because such documents are not part of the administrative record in the first instance and therefore "do not need to be logged." *Id*. (*citing Oceana,* 920 F.3d at 865).

According to WAPA, Petitioners' request "assumes documents were withheld on the basis of a claimed privilege," but that assumption "is incorrect." *Id*. at 11–12 (*quoting American Wild Horse Campaign v. Stone-Manning*, No. 2:23-cv-84 (D. Wyo. Oct. 30, 2023), Dkt. No. 46).[10] Rather, they contend, internal drafts and deliberative materials have

[10] The Court acknowledges Respondent WAPA's filing, ECF No. 35-4, in which a prior magistrate judge in this district declined to compel a privilege log based on an argument that the records at issue were protected by the agency's deliberative process. While the Court notes that filing, it does not find it persuasive under the circumstances here. The

been excluded because they reflect agency mental processes, not the evidence actually considered by the decisionmaker. *Id*. at 16. WAPA cites a few appellate and district court decisions adopting this reasoning. *See, e.g., Oceana, 920 F.3d at 865; Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 444 (9th Cir. 2024); *Friends of Animals v. U.S. Fish & Wildlife Serv.*, 2019 WL 8137578, at *3 (D. Utah Dec. 27, 2019).

These cases, they argue, confirm that "it is relevance that excludes those documents from the record, not that the documents could be privileged." ECF No. 35 at 17. Respondents therefore contend that Local Rule 83.6(b)(2) does not apply because it requires a log only for materials "withheld under a claim of privilege." *Id*. at 14. Since WAPA did not invoke any privilege, they believe that the rule does not compel a log.

Finally, WAPA contends that Petitioners mischaracterize the handling of culturally sensitive documents listed in the Certified Index of Confidential Administrative Record Documents. ECF No. 35 at 14–15, 18. WAPA asserts it already identified these documents as part of the record but withheld them from public release under NHPA § 304 and ARPA § 9, due to potential confidentiality protections. *Id*. at 14. Respondents note that they offered to "meet and confer" about producing the materials in redacted or protected form, but Petitioners declined. *Id*. at 19. Thus, WAPA maintains there is no ripe dispute and no basis for ordering production of a privilege log. *Id*. at 6.

---

facts of this case support applying this Court's local rule and require a privilege log for any documents withheld on the basis of the deliberative process privilege. *See Smith v. United States*, 626 F.2d 796, 796 (10th Cir. 1980) (courts are afforded deference in interpreting and applying their own rules of practice and procedure) (*citing Martinez v. Thrifty Drug & Discount Co*., 593 F.2d 992 (10th Cir. 1978)).

Despite Respondents' extensive argument on this point, the Local Rule forecloses any ambiguity regarding deliberative documents. The Rule states, in pertinent part, that, "[t]o the extent practicable … the agency shall provide a log describing any document(s) withheld under a claim of privilege, including a claim that the document(s) reflect the *deliberative process of the agency*." U.S.D.C.L.R 83.6(b)(2) (emphasis added).

The Local Rules apply in all civil action proceedings and "have the force and effect of law and are binding upon the parties and the court which promulgated them...." *Iversen v. Sentinel Ins. Co., Ltd.*, 2014 WL 11498046, at *2 (D. Wyo. Apr. 25, 2014) (quoting *Smith v. Ford Motor Co.*, 626 F.2d 784, 796 (10th Cir.1980)); *see also* U.S.D.C.L.R. 1.1(b); *Redfield v. Campbell Cnty. Health*, 2021 WL 2941559, at *2 (D. Wyo. Mar. 1, 2021) ("The Local Rules For [sic] the United States District Court for the District of Wyoming apply in all civil action proceedings. U.S.D.C.L.R. 1.1(b).").

Accordingly, given the Local Rule's plain language, Respondents must include with any supplementation of the Administrative Record a privilege log describing all withheld materials, whether withheld under claims of privilege, deliberative process, or cultural confidentiality.

**IT IS THEREFORE ORDERED** that Respondents shall include a privilege log with their supplementation of the Administrative Record, consistent with Local Rule 83.6(b)(2).

## CONCLUSION

The Court finds that the HPTP constitutes a final agency action subject to review under the APA. Petitioners have overcome the presumption of completeness of the

Administrative Record, and Respondents are therefore required to supplement the record to include all materials directly or indirectly considered in preparing the HPTP.

In addition, Respondents must provide a privilege log consistent with Local Rule 83.6(b)(2), describing any documents withheld, including those withheld under claims of privilege or reflecting the agency's deliberative process. Accordingly, Petitioners' *Motion to Complete the Administrative Record* [ECF No. 29] is **GRANTED**. The Court will contact the parties to schedule a status conference. At that conference, the parties will discuss a reasonable timeframe for Respondents to file the supplemental administrative record and privilege log. The Court will also address, and set, the merits-based briefing schedule at that time.

Dated this 13th day of November, 2025.

Scott P. Klosterman
United States Magistrate Judge